683 So.2d 714 (1996)
In re Ernest L. CAULFIELD.
No. 96-B-1401.
Supreme Court of Louisiana.
November 25, 1996.
Rehearing Denied December 13, 1996.
*715 Charles B. Plattsmier, G. Fred Ours, Baton Rouge, Gregory F. Gambel, New Orleans, for Applicant.
Ernest Lee Caulfield, Timothy G. Schafer, Maurice Anthony Williams, New Orleans, for Respondent.

DISCIPLINARY PROCEEDINGS
KIMBALL, Justice[*]
Respondent Ernest L. Caulfield was formally charged with engaging in misconduct contrary to Rules of Professional Conduct 3.1, 3.3, 3.4, and 8.4(a)(b)(c) and (d). It is alleged that Respondent and Alfred Miller staged a fake automobile accident in New Orleans on August 22, 1987 for the purpose of defrauding Hertz Corporation and its insurer by means involving dishonesty, fraud, deceit, and misrepresentation. Respondent claims the charges against him should be dismissed based upon: (1) the Disciplinary Board's application of the manifest error rule to the conclusions reached by the Hearing Committee; (2) the weight attributed by the Hearing Committee and Disciplinary Board to the evidence presented at the civil RICO trial concerning this accident; and (3) the failure of the evidence presented to the Hearing Committee and Disciplinary Board to meet the clear and convincing standard.

FACTS
On August 22, 1987, Respondent and Alfred Miller reported to the New Orleans Police Department that a car operated by Miller and owned and insured by the Hertz Corporation collided with the rear of a car owned and operated by Respondent near the railroad overpass on Gentilly Boulevard. Alfred Miller told the investigating police officer that he was driving very fast and that he struck Respondent's car because he was temporarily blinded by the sunlight when he came out from under the railroad trestle. According to Miller, he was in a hurry to reach his girlfriend's house because his girlfriend's child was ill. The investigating officer recognized Respondent as an attorney and recognized Miller as a former employee of the police department and as a RTA bus driver. According to the investigating officer, neither Respondent nor Miller indicated that they knew each other at the scene of the accident. Out of curiosity and because the officer recognized both men, he asked Miller if he knew Respondent. The officer testified that Miller failed to answer the question and that the subject matter of the conversation changed. The evidence clearly establishes that Respondent and Miller did in fact know each other.[1] However, in testimony later adduced, Respondent and Miller claimed they did not recognize each other at the accident scene.
Neither respondent nor Miller suffered from any apparent physical injuries such as lacerations or bruises; nor did either of them complain of any physical injury. However, in the fall of 1987, Respondent sought treatment for neck pain that he alleges was caused by the August accident. Respondent was diagnosed as suffering from spondylosis and degenerative disc disease. On February 2, 1989, surgery was performed on Respondent to correct this problem. Both cars were *716 driveable and the damage to both cars was classified as "moderate" by the investigating police officer. At the time of the accident, Alfred Miller had rented the car he was operating from Hertz Corporation because, according to Miller, his car was not running well and the air conditioning was not working. Testimony elicited from Miller indicated that he could have borrowed a car from friends instead of renting a car from Hertz. Miller was a bus driver for RTA and earned approximately $350.00 every two weeks. The evidence in the record also shows that Miller could not afford to purchase liability insurance on his own car and that his wages were being garnished at the time he rented the car from Hertz. However, when Miller rented the car, he purchased one million dollars worth of liability insurance from Hertz. Miller testified that no Hertz employee encouraged him to purchase this insurance. The total price for this three day package rental was $141.27.
In October of 1987, Respondent filed a personal injury suit against Miller, Hertz, and Hertz's insurer. When Hertz inspected the two vehicles in 1988, its experts began to suspect that the accident had been staged. Hertz filed a civil suit under the Civil Racketeer Influenced Corrupt Organization Act (RICO) against Respondent and Miller in the United States District Court for the Eastern District of Louisiana. A jury returned a verdict against Respondent and Miller in the amount of $410,528.88, plus interest, attorneys fees, and costs in the amount of $97,741.87. The United States Court of Appeals for the Fifth Circuit affirmed the jury's verdict. Subsequently, Respondent dropped his personal injury suit against Hertz and Hertz's insurer.
The Office of Disciplinary Counsel then formally charged Respondent with staging a fake automobile accident in violation of Rules of Professional Conduct 3.1, 3.3, 3.4, and 8.4(a)(b)(c) and (d). In the disciplinary proceedings before the Hearing Committee, disciplinary counsel introduced without objection the entire record of the civil RICO trial. The Hearing Committee read the entire RICO transcript and heard an additional three days worth of testimony. The Hearing Committee found clear and convincing evidence that Respondent violated the above stated Rules of Professional Conduct by staging an automobile accident in an attempt to defraud Hertz. In reaching this conclusion, the Hearing Committee applied the clear and convincing standard to all the evidence presented, including the evidence introduced from the RICO trial.[2] Based upon the seriousness of the charge and the fact that no mitigating circumstances were found, the Hearing Committee recommended that Respondent be disbarred from the practice of law.
The Disciplinary Board approved the findings and conclusions reached by the Hearing Committee and adopted the disbarment sanction recommended by the Hearing Committee. In reaching this conclusion, the Disciplinary Board stated that it was applying the manifest error standard of review to the Hearing Committee's report and that the Hearing Committee's findings and conclusions were not manifestly erroneous.
Respondent contends the charges against him should be dropped because the Disciplinary Board's application of the manifest error standard of review to the Hearing Committee's findings and conclusions was erroneous, the Hearing Committee and Disciplinary Board afforded the evidence from the civil RICO trial greater weight than it should have and because the evidence presented against Respondent fails to meet the clear and convincing standard applicable in bar disciplinary proceedings.

LAW AND DISCUSSION
Respondent maintains that the Disciplinary Board erred when it applied the "manifest error rule" to the factual findings and conclusions reached by the Hearing Committee. In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard which precludes the setting aside of a trial court or jury's finding of fact unless those findings are clearly wrong in *717 light of the record reviewed in its entirety. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706; Rosell v. ESCO, 549 So.2d 840 (La.1989). This same standard of appellate review applicable to the factual findings of a district court is also applicable to the factual findings of an administrative body or hearing officer. Walters v. Department of Police of the City of New Orleans, 454 So.2d 106 (La.1984),
Under La. S.Ct. R. 19 § 11(F), the Hearing Committee functions as the initial trier of fact and the Disciplinary Board serves an appellate review function. This court has approved of the Disciplinary Board's application of the manifest error standard to the findings of the Hearing Committee. In re Pardue, 93-2865 (La.3/11/94), 633 So.2d 150[3]. Bar matters are not criminal proceedings[4]; therefore the application of this standard does not violate any of Respondent's constitutional rights. Thus, it was appropriate for the Disciplinary Board in this case to apply the manifest error standard to the Hearing Committee's findings.
Respondent also contends that the Hearing Committee and Disciplinary Board erred by affording special weight to the evidence presented from the RICO trial transcript. In addition, Respondent contends that the Hearing Committee and Disciplinary Board also afforded the RICO trial evidence special weight because the jury in the RICO case found against Respondent. These claims are not supported by the record. Both the Hearing Committee and Disciplinary Board stated in the record that they understood the misconduct of Respondent must be proven by clear and convincing evidence. It is clear from the record that both the Hearing Committee and Disciplinary Board applied the clear and convincing standard to the evidence that was presented from the RICO trial transcript and did not assign greater weight to that evidence just because a civil jury found against Respondent.
Finally, Respondent maintains that there is no clear and convincing evidence that he staged an automobile accident in violation of the Rules of Professional Conduct. Formal charges of attorney misconduct must be proven by clear and convincing evidence. La. S.Ct. R. 19 § 18(C); In re King, 601 So.2d 657 (La.1992). A finding of professional misconduct may be based upon circumstantial evidence. Louisiana State Bar Association v. St. Romain, 560 So.2d 820 (La. 1990). "Clear and convincing evidence, in general, means that the fact of guilt must be proven to a greater degree than by a mere preponderance of the evidence but less than by beyond a reasonable doubt." Louisiana State Bar Association v. Edwins, 329 So.2d 437, 442 (La.1976).
This court has original jurisdiction over all bar disciplinary matters. La. Const. art. V, § 5(B). Consequently, this court conducts an independent review of the evidence contained in the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. La. S.Ct. R. 19 § 11(G); In re Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Association v. Boutall, 597 So.2d 444 (La.1992). Therefore, this court must now determine if this record contains clear and convincing evidence that Respondent staged an automobile accident in an attempt to defraud Hertz in violation of the Rules of Professional Conduct.
We find there is more than ample evidence in the record supporting a finding, under the clear and convincing standard, that Respondent staged an automobile accident in an attempt to defraud the Hertz Corporation in violation of Rules of Professional Conduct 3.1, 3.3, 3.4, and 8.4(a)(b)(c) and (d). First, the evidence clearly establishes that Respondent and Miller knew each other prior to the accident. Miller was a witness in a personal injury case that Respondent handled in 1986. On February 6, 1986, in connection with the personal injury case in which Miller was a witness, Respondent transported Miller to *718 and from a deposition. Respondent also paid Miller out of Respondent's personal account for the amount of time Miller missed from work to give his deposition testimony. A secretary in Respondent's law firm testified in the disciplinary hearing that she saw Miller in the law office speaking with Respondent during the time that Respondent was working on the personal injury case in which Miller was a witness. The record also establishes that prior to the accident, Miller was employed as a runner[5] at respondent's law firm. Respondent maintains he was unaware of Miller's employment at his law firm. However, Respondent signed at least five checks made payable to Alfred Miller. According to the evidence in the record, these checks were Miller's referral fee payments. Respondent also asked the city attorney not to pursue the traffic citation that had been issued to Miller in connection with this accident. In spite of all the factual evidence showing that Respondent and Miller did in fact know each other, both men maintain they did not recognize each other at the accident scene.
Second, all of the expert testimony in this case shows that this accident did not occur in the manner claimed by Respondent and Miller. Even Respondent's own expert conceded there was no way the accident occurred the way Respondent and Miller claimed it did. While Miller's testimony as to exactly how fast he was going at the time of the accident varied, Miller consistently maintained that he was traveling at a high rate of speed at the time of the accident. Respondent testified that he was traveling twenty to twenty-five miles per hour at the time of the accident. There was no debris such as glass or pieces of the vehicles at the scene of the accident. Both cars were driveable and the damage done to both cars was classified as moderate.[6] Neither Respondent nor Miller displayed any visible signs of injury; nor did either of them complain of physical injury at the accident scene. According to accident reconstruction expert Raymond Charles Burkart Jr., a crash of the magnitude described by Respondent and Miller would have produced significant debris[7] and caused extensive damage to both cars[8]. Mr. Burkart also testified that a crash of such magnitude would have inflicted visible physical injury upon the victims of the crash. Furthermore, the positions of the cars, as reported by the investigating officer, fails to support Respondent's version of the accident. Based upon all of this physical evidence, Mr. Burkart concluded that the damage done to both vehicles was more consistent with them first having been backed into a wall and then into each other.
Third, the circumstances surrounding Miller's renting of the Hertz car are highly probative and very incriminating. At the time of the accident, Miller was a man of limited financial resources[9], who could not afford to purchase liability insurance on his own vehicle. Despite these facts, Miller rented a car from Hertz for a weekend at a cost of $141.27 just because his own car was not running well and the air conditioner was broken. In this regard, Miller testified that he did not rent the car for any special occasion and that he could have borrowed a car from friends. Adding to this probative circumstance is the fact that Miller took out a one million dollar liability insurance policy on the Hertz car that increased the cost of the rental when he was not required to do so. Furthermore, Miller testified he was in a hurry because he was on his way to see a sick child when the accident occurred. However, Miller never went to visit the sick child after the accident even though his car was driveable. In addition to the above probative facts and circumstances, Miller did not take *719 the shortest route to his girlfriend's house even though he was supposedly in a hurry to see the sick child.
While it is true that Respondent underwent surgery on February 2, 1989, there is no evidence that this surgery was necessitated by the accident that occurred on August 22, 1987. Medical experts, including Respondent's expert, testified that Respondent's degenerative disc disease is commonly associated with the normal aging process[10]. The record also indicates that Respondent was involved in an automobile accident in 1982, and sued to recover damages for the neck injury he sustained in that accident. The medical experts, including Respondent's expert, stated that most doctors would not recommend surgery for degenerative disc disease. Respondent and other witnesses testified that Respondent was terrified about the prospect of surgery. However, Respondent never sought a second opinion as to whether surgery was really required to correct his degenerative disc disease.
All of these facts and circumstances, when taken together, provide clear and convincing evidence that Respondent and Miller staged this fake automobile accident in an attempt to defraud Hertz. Therefore, we agree with the Hearing Committee's and Disciplinary Board's conclusion that Respondent violated Rules of Professional Conduct, 3.1, 3.3, 3.4, and 8.4(a)(b)(c) and (d).

SANCTION
Having found that Respondent staged a fake automobile accident in violation of the Rules of Professional Conduct, we must now determine the appropriate sanction to impose upon Respondent. Both the Hearing Committee and the Disciplinary Board recommended that Respondent be disbarred from the practice of law. The act of staging a fake automobile accident in order to collect money violates the ethical duty Respondent owes to the public, the legal system, and the legal profession. This court has previously imposed the sanction of disbarment upon attorneys who stage automobile accidents. See Louisiana State Bar Association v. Doggett, 534 So.2d 941 (La.1988); Louisiana State Bar Association v. Tunis, 352 So.2d 623 (La.1977); Louisiana State Bar Association v. Hamilton, 343 So.2d 985 (La.1977); Louisiana State Bar Association v. Hennigan, 340 So.2d 264 (La.1976); Louisiana State Bar Association v. Shaheen, 338 So.2d 1347 (La.1976); Louisiana State Bar Association v. Loridans, 338 So.2d 1338 (La.1976).
The sanction imposed in a bar disciplinary matter is adjusted in accordance with the presence of aggravating and mitigating factors. ABA Standards, § 3.0. Neither the Hearing Committee nor the Disciplinary Board listed any specific aggravating or mitigating circumstances.[11] Absence of a prior disciplinary record is a mitigating circumstance under ABA Standards § 9.32. There is no evidence in the record that shows Respondent has a prior disciplinary record. However, we also find the presence of an aggravating circumstance under ABA Standards § 9.22, as Respondent engaged in the scheme out of a dishonest and selfish motive.
Based upon the seriousness of the offense and the fact that the mitigating circumstance does not outweigh the aggravating circumstance, we agree with the Hearing Committee and Disciplinary Board that disbarment is the appropriate sanction in this case.

DECREE
For the reasons assigned, it is ordered that the name Ernest L. Caulfield be stricken from the roll of attorneys and that Respondent's license to practice law in the State of Louisiana be revoked and cancelled at his cost.
DISBARMENT ORDERED.
NOTES
[*] Johnson, J., not on panel. See Rule IV, Part 2, § 3.
[1] The evidence introduced at the RICO trial and at the disciplinary proceedings showed that prior to the accident, Miller had been a witness in one of Respondent's cases and that Respondent had driven Miller to and from a deposition. Miller testified in the RICO trial that he would see Respondent around town and that he knew him but just did not recognize him at the accident scene. The evidence also showed that Miller was employed by Respondent's firm which consisted of two attorneys and support personnel. However, Respondent claims he was unaware of Miller's employment at his firm.
[2] The Hearing Committee's report details the specific facts and evidence they relied upon in reaching their conclusion.
[3] In Pardue, this court determined that the Hearing Committee's findings were not supported by clear and convincing evidence and stated that the Disciplinary Board erred in accepting the Hearing Committee's findings as not being manifestly erroneous.
[4] Louisiana State Bar Association v. Sanders, 568 So.2d 1025 (La.1990).
[5] As a runner, Miller would refer clients to Respondent's law firm and in return for this service, Miller would be paid a referral fee. We note that this practice is a violation of the Rules of Professional Conduct 7.2(c) which provides "[a] lawyer shall not give anything of value to a person for recommending the lawyer's services."
[6] The cost to repair Respondent's BMW was only $3,315.10.
[7] The investigating officer testified that he was surprised that there was no debris at the accident scene.
[8] Mr. Burkart classified the damage done to both vehicles as "medium."
[9] Alfred Miller only made $350.00 every two weeks as a RTA bus driver. The evidence in the record also shows that Miller's wages were being garnished at the time of the accident.
[10] However, Respondent's expert did testify that the degenerative changes in Respondent's neck could have been rendered symptomatic as a result of the August 22, 1987 accident.
[11] The Hearing Committee did state that Respondent displayed a lack of remorse and little appreciation of the fundamental dishonesty of the scheme in which he participated.