ATTORNEY DISCIPLINARY PROCEEDINGS
LPER CURIAM.
This disciplinary matter arises from one count of formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, M. Daniel LaGrone, Jr., an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS
In the spring of 1994, James and Melanie Hutchinson incurred significant medical expenses resulting from complications of Mrs. Hutchinson’s pregnancy and the *1058 subsequent premature birth of the couple’s son, Kyle. Seeking relief from these and other debts, Mr. and Mrs. Hutchinson retained respondent to institute bankruptcy proceedings on their behalf. On May 23, 1994, respondent filed a Chapter 13 petition on behalf of his clients. In re Hutchinson, No. 94-BK-30513 on the docket of the United States Bankruptcy Court for the Western District of Louisiana, Monroe Division. On June 28, 1994, respondent filed schedules in the bankruptcy case in which Mr. and Mrs. Hutchinson attested that their assets totaled $10,220.00 and their liabilities totaled $73,623.92. The largest liability listed in the bankruptcy schedules was a $57,272.56 unsecured debt owed by the Hutchinsons to St. Francis Medical Center, the Monroe hospital where Mrs. Hutchinson and Kyle were treated. There was no insurance claim disclosed in the bankruptcy schedules as an asset owned by the Hutchinsons; notwithstanding this fact, at the time his wife and son were treated | ¡.at St. Francis, Mr. Hutchinson had medical insurance provided through his employer by Blue Cross of Louisiana.
St. Francis filed claims with Blue Cross for the medical expenses incurred by Mrs. Hutchinson and Kyle. Blue Cross paid the claims in a series of four checks that were dated June 27, 1994; June 28, 1994; July 1,1994; and July 26,1994. However, Blue Cross sent these checks — which totaled more than $70,000 — directly to Mr. and Mrs. Hutchinson, rather than to St. Francis, because the hospital had not perfected an assignment of the Blue Cross insurance proceeds.
It appears from the record that respondent first learned of the existence of the insurance claim and the Blue Cross proceeds sometime in late July or early August 1994. It is important to note, however, that respondent believed (erroneously) the insurance proceeds were assigned to St. Francis. On August 1, 1994, a representative of St. Francis telephoned respondent’s office to inquire about the issuance of the Blue Cross checks to the Hutchin-sons. Unfortunately, by this time, Mr. and Mrs. Hutchinson had already spent several thousand dollars of the money sent to them by Blue Cross. On August 12, 1994, pursuant to respondent’s direction, the Hutchinsons delivered the remainder of the insurance proceeds in their possession — two checks totaling $61,242.56 — to respondent. Respondent’s paralegal gave the checks to the office manager and instructed her to “lock these checks up in a safe place until [respondent] has finalized his attempts and settlements [sic] with the hospital.”
On August 17, 1994, the Chapter 13 bankruptcy trustee, Paul Davidson, conducted a meeting of creditors (known as a “341 meeting”)[1] in the Hutchinson case. Mr. and Mrs. Hutchinson appeared at the hearing, and were represented by respondent’s associate, Stacy Sessum. The transcript of the 341 meeting reveals that|3Ms. Sessum made no reference to the insurance proceeds that had been received by the Hutchinsons in June and July.[2]
*1059 On August 19, 1994, respondent sent a letter to St. Francis offering to compromise the medical bills owed for the care of Mrs. Hutchinson and Kyle:
Mr. and Mrs. Hutchinson are having significant financial problems and have, frankly, spent some of the insurance funds due you on the above referenced accounts related to the premature birth of their child.
I am inquiring as to your position, as they can send $52,000 of the $57,300 they owe, but would like the balance of their debt canceled so that they do not have to file a Chapter 7 bankruptcy. Please advise as to your position as soon as possible. Your time and attention in this matter are greatly appreciated.
On August 25, 1994, respondent deposited the insurance proceeds into his client trust account. The following day, he sent letters to the rest of Mrs. Hutchinson’s medical providers (substantially similar to the August 19 letter to St. Francis), offering to compromise the accounts for a portion of the amount owed.
One of Mr. and Mrs. Hutchinson’s non-medical creditors, Friendly Finance Service, subsequently objected to the Chapter 13 plan the couple had proposed. This objection triggered a hearing before the bankruptcy court on September 14, 1994. Once again, Mr. and Mrs. Hutchinson were represented at the hearing by respondent’s associate, Ms. Sessum. The transcript of the hearing reveals that Ms. Ses-sum disclosed to the court and to the trustee that “There’s substantial insurance proceeds that we are holding and we’re going to be paying off a substantial portion of the | unsecured creditors with that money. And then we’ll, in addition, put that in our modification ...”[3] Nevertheless, when the amended Chapter 13 plan was filed on September 28, 1994, no mention was made of the Blue Cross proceeds. Rather, respondent simply proposed to (1) increase the amount of the payments required of the Hutchinsons duripg the pendency of the Chapter 13; (2) modify the treatment of several creditors, including Friendly Finance; (3) add previously omitted creditors; and (4) request additional attorney’s fees. By order dated October 28, 1994, the bankruptcy court confirmed Mr. and Mrs. Hutchinson’s Chapter 13 plan, as amended.
On October 20, 1994, Mr. Hutchinson had a heart attack. On November 17, 1994, without notice to the creditors, the trustee, or the court, respondent disbursed $1,000 to the Hutchinsons for living expenses. The cover letter accompanying the check specifically noted that the funds came “from the insurance funds we are holding in trust for you.” [4]
On March 17, 1995, respondent filed a motion to dismiss the Hutchinsons’ bankruptcy. The court granted the motion on March 20, 1995. Thereafter, between March 27, 1995 and April 18, 1995, respondent disbursed the remaining sums in his trust account as follows: $850 to the Hutchinsons to repay an unspecified creditor; $1,627 to The Woman’s Clinic, one of Mrs. Hutchinson’s health care providers; $2,500 to himself as attorney’s fees (in addition to the fees he collected through the bankruptcy proceeding); and $55,265.56 to the Hutchinsons. By the *1060 time St. Francis [¿earned of this turn of events, the Hutchinsons had spent nearly all of the money respondent had returned to them.[5]
In July 1999, a federal grand jury returned a two-count indictment charging respondent with bankruptcy fraud[6] in connection with his handling of the Hutchinson matter. United States v. Murlyn Daniel LaGrone, Jr., No. 99-CR-50069 on the docket of the United States District Court for the Western District of Louisiana, Shreveport Division. Following a jury trial in January 2000, respondent was acquitted on the first count of the indictment. The second count was subsequently dismissed by the government because the jury could not reach a verdict as to that count.
DISCIPLINARY PROCEEDINGS
In April 1997, United States Bankruptcy Judge Stephen V. Callaway filed a complaint against respondent with the ODC. On July 24, 2000, the ODC filed one count of formal charges against respondent, alleging that his conduct in the Hutchinson matter violated the following Rules of Professional Conduct: Rules 1.1 (failure to provide competent representation to a client), 1.3 (failure to act with diligence and promptness in representing a client), 1.4(b) (failure to give the client sufficient information to participate intelligently in the representation), 1.5(a) (charging an unreasonable legal fee), 1.15 (safekeeping property of clients or third ^persons), 3.4(c) (knowing disobedience of an obligation under the rules of a tribunal), 8.4(a) (violation of the Rules of Professional Conduct), and 8.4(d) (engaging in conduct prejudicial to the administration of justice). Respondent answered the formal charges and denied any misconduct in his handling of the Hutchinson bankruptcy case. Specifically, respondent asserted that he had not intentionally concealed from the court the existence of the insurance funds, and that in any event, the Blue Cross proceeds did not form a part of the Hutchinsons’ bankruptcy estate because the proceeds had been assigned by the Hutchinsons to St. Francis.[7]

Hearing Committee Recommendation

This matter proceeded to a formal hearing on the merits on February 6, 2001. The ODC introduced a volume of documentary evidence in support of the formal charges and called Judge Callaway to tes *1061 tify in person before the committee. Respondent appeared and cross-examined Judge Callaway; he also testified on his own behalf.
In its July 9, 2001 report, the hearing committee relied heavily upon the testimony given by Judge Callaway, which was accepted as “factual and authoritative.” Based upon that testimony, the committee found:
1.Schedules are filed in a bankruptcy proceeding and provide a listing of the assets, debts, income, and expenses of the debtors. The bankruptcy judge, trustee, and creditors rely on these schedules when making decisions regarding the bankruptcy.
[72. The right to receive insurance proceeds is an asset of the debtor and should be listed in the schedules.
3. If the debtor’s counsel discovers that assets, including cash, have been received by the debtor during the period of the Chapter 13 bankruptcy, or that the debtor has assets that were not listed in the schedules, then these assets should be included in the bankruptcy estate by the filing of an amended schedule, and such amended schedule should be filed as soon as possible.
After reviewing the evidence, the committee made numerous additional findings, including:
1. Respondent was not aware of the Hutchinsons’ claim against Blue Cross when the initial bankruptcy schedules were prepared and filed with the bankruptcy court on June 28, 1994. The debt to the hospital was listed as a liability in the schedules, but there was no mention of any insurance proceeds due the Hutchinsons.
2. On September 14, 1994, the confirmation hearing on the Hutchinsons’ Chapter 13 plan was held. Ms. Stacy Sessum, respondent’s associate, made specific mention of the insurance proceeds in court. The plan was not approved as the debtors were behind in their payments and there was an objection to the plan.
3. On September 28, 1994, Ms. Ses-sum filed material modifications to the Hutchinsons’ Chapter 13 plan, but still no amendment of the schedules was filed which would show that respondent was holding $61,242.56 in his trust account for the Hutchinsons.
4. The Chapter 13 plan was confirmed as amended on October 28, 1994, but still no amendment of the schedules was filed.
5. On November 17, 1994, respondent issued a $1,000 check to the Hutch-insons from his trust account without approval from the Bankruptcy Court.
| «6. On March 20, 1995, the Chapter 13 case was dismissed; to this point, there had still been no amended schedules filed which would disclose the funds that respondent was holding in his trust account.
7. Respondent initially contended that the proceeds had been assigned by the debtors to St. Francis Medical Center, and therefore, were not part of the bankruptcy estate. Respondent subsequently abandoned this position.
8. Respondent obviously knew of the insurance proceeds when he deposited them into his trust account on August 25,1994.
9. Respondent acknowledged that at least by November 17,1994, he was *1062 aware that the Chapter 13 plan had been confirmed on October 28,1994 and that it had been confirmed based on disclosures that were not appropriate.
10. Respondent had a duty to amend the schedules and make the proper disclosure as soon as possible.
11. Instead of amending the schedules, respondent continued his efforts to work out settlements with creditors outside the course of the bankruptcy proceeding.
12. Respondent ultimately turned the funds over to the Hutchinsons with the instructions that Mr. Hutchinson should pay the funds to various creditors.
13. The insurance proceeds were not properly administered in accordance with the Bankruptcy Code. Respondent should have handled the funds in the manner described by Judge Callaway. Respondent’s actions caused harm to the Hutch-insons, their creditors, and the legal system.
14. As a result of respondent’s mishandling of the case, the Hutchinsons had to file another bankruptcy in 1996.
15. Respondent is an experienced bankruptcy attorney, having practiced bankruptcy law in the Western District of Louisiana for many years.
|gBased on these factual findings, the committee found that respondent faded to provide competent representation to Mr. and Mrs. Hutchinson, a violation of Rule 1.1 of the Rules of Professional Conduct; failed to act with reasonable diligence and promptness in representing the Hutchin-sons, a violation of Rule 1.3; knowingly disobeyed an obligation under the rules of the bankruptcy court, in violation of Rule 3.4(c); and engaged in conduct prejudicial to the administration of justice, in violation of Rule 8.4(d). The committee further stated that it was “unsure about a violation of Rule 1.5(a) (fees) and therefore does not find that sufficient evidence was produced to conclude that there was a violation of this rule.” The committee made no findings as to the alleged violations of Rules 1.4(b), 1.15, and 8.4(a).
The committee determined that respondent’s conduct caused harm to his clients, their creditors, and the legal system. The committee explained that it did not accept respondent’s explanation or excuse that “he did not know what to do with these funds, and that when he ultimately turned the funds over to Mr. Hutchinson, he did so with instructions that Mr. Hutchinson should pay the funds to the various creditors,” citing the fact that the respondent is an experienced bankruptcy attorney in the Western District of Louisiana. The committee noted two aggravating factors are present, namely respondent’s prior disciplinary record[8] and his refusal to acknowledge the wrongful nature of his conduct. Based on this reasoning, the committee recommended that respondent be suspended from the practice of law for a period of six months.
Both respondent and the ODC filed objections to the hearing committee’s report and recommendation.

11(>Disciplinary Board Recommendation

After reviewing the record of this matter, the disciplinary board found that the *1063 hearing committee’s factual findings are supported by the record and that the committee correctly applied Rules 1.1, 1.3, 3.4(c), and 8.4(d) of the Rules of Professional Conduct. The board specifically rejected respondent’s assertion, raised for the first time before the hearing committee, that his handling of the insurance proceeds was appropriate because the funds were exempt property under state law. The board noted that property claimed by the debtor to be exempt must nevertheless be disclosed in the bankruptcy schedules. The board further found that the committee erred in failing to find violations of Rules 8.4(a) and 1.15(b). The board concluded that upon receipt of the Blue Cross insurance proceeds, respondent failed to protect the interests of third parties (St. Francis Medical Center, the other bankruptcy creditors, and/or the bankruptcy trustee) in the funds when he failed to notify these parties of his receipt of the funds and failed to subsequently protect these funds for the appropriate distribution through the bankruptcy proceeding. Finally, the board agreed that the committee properly found that no violations of Rules 1.4(b), 1.5(a), or 1.15(c) are present, given that the ODC failed to present clear and convincing evidence supporting those allegations.
The board found respondent knowingly, if not intentionally, violated duties owed to his clients, the public, and the legal sys-tern. The amount of injury was substantial — the insurance proceeds were not properly administered in accordance with the Bankruptcy Code, and as a result, St. Francis Medical Center was paid only $100 of the amount it was owed and the Hutch-insons later had to file another bankruptcy proceeding. The board concurred in the two aggravating factors cited by the hearing committee, and added respondent’s substantial experience in the practice of law (admitted 1971) as a third such factor.
lulu light of these considerations, the ABA’s Standards for Imposing Lawyer Sanctions, and the prior jurisprudence,[9] the board recommended that respondent be suspended from the practice of law for six months. The board also recommended that respondent be assessed with all costs and expenses of these proceedings, with legal interest to commence running thirty days from the date of finality of the court’s judgment until paid.
Neither respondent nor the ODC filed a timely objection to the disciplinary board’s recommendation.
DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convinc *1064 ing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343;. Louisiana State Bar Ass’n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in anyway by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
haBased on our independent review, we agree that the factual findings of the hearing committee are well supported by the evidence. We also agree that these factual findings support the disciplinary board’s conclusion that respondent’s mishandling of his clients’ bankruptcy matter violated Rules 1.1, 1.3, 1.15(b), 3.4(c), 8.4(a), and 8.4(d) of the Rules of Professional Conduct.
Having found professional violations, we now turn to a determination of the appropriate sanction for this misconduct. In determining an appropriate sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
We have never before been confronted with a disciplinary matter involving misconduct substantially similar to respondent’s at issue here. Nevertheless, we find that under the ABA’s Standards for Imposing Lawyer Sanctions,[10] the appropriate baseline sanction for respondent’s knowing misconduct is a suspension. The aggravating factors present include respondent’s prior disciplinary record, his refusal to acknowledge the wrongful nature of his conduct, and his substantial experience in the practice of law. In mitigation, the record supports a finding that respondent lacked a dishonest or selfish motive and that he displayed a cooperative attitude toward the | ^disciplinary proceedings. In light of all these factors, we cannot say that the six-month suspension recommended by the disciplinary board is inappropriate.
Accordingly, we will suspend respondent from the practice of law for six months.
DECREE
Upon review of the findings and recommendation of the hearing committee and disciplinary board, and considering the record, it is ordered that M. Daniel La-Grone, Jr. be suspended from the practice of law in Louisiana for a period of six months. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. Conducted pursuant to 11 U.S.C. § 341, such meetings are non-judicial hearings in which the creditors and the trustee have an opportunity to orally examine the bankruptcy debtor.

. Respondent later claimed that just prior to the start of the 341 meeting, he had a private conversation with Mr. Davidson in which he alerted the trustee that he was holding $60,000 in insurance proceeds on behalf of the Hutchinsons. Mr. Davidson denied any recollection of such a conversation. He admitted that he knew the Hutchinsons had received some insurance money, but he believed the sum to be only about $10,000, not $60,000. In any event, Mr. Davidson trusted that respondent would take care of reporting *1059 the post-petition insurance proceeds to the bankruptcy court.

. Ms. Sessum did not know exactly how much the insurance proceeds were, but thought the amount was about $10,000. Respondent later conceded that Ms. Sessum was unaware the amount involved was more than $60,000.

. Respondent later claimed that the $1,000 represented a "rebate” on his attorney’s fees.

. One witness candidly stated that the Hutch-insons spent the funds as though they had just "won the lottery.” The Hutchinsons later admitted to having purchased a new pickup truck, a boat and trailer, and a jet ski. They also paid off the balance of their mobile home loan and acquired the land on which the home was situated, made loans to various relatives, took a vacation to Hot Springs, Arkansas, and paid other medical expenses.

. In Count I of the indictment, the government charged that respondent "did knowingly and fraudulently conceal and cause to be concealed from creditors, from the Chapter 13 Standing Trustee of the estate, and from the United States Trustee checks in excess of $57,000.00,” in violation of 18 U.S.C. § 152(1) and § 2. Count II charged that respondent, "with the intent to defeat the provisions of Title 11, knowingly and fraudulently received a material amount of property from James W. Hutchinson under Title 11, to-wit: insurance checks in excess of $57,000.00,” in violation of 18 U.S.C. § 152(5). The government filed no criminal charges against the Hutchinsons.

. In support of this legal principle, respondent cited case law holding that insurance proceeds which have been assigned belong to the assignee, not to the estate of the debtor, and hence are not required to be reported to the bankruptcy court or turned over to the trustee. See, e.g., In re Moskowitz, 14 B.R. 677 (Bankr.S.D.N.Y.1981). However, such law is inapplicable to the facts of the Hutchinson case, in which no assignment had been perfected on the Blue Cross insurance proceeds.

. Respondent has been admonished by the disciplinary board on two occasions, both relating to improper advertising of his legal services. See 95-ADB-090 (improper newspaper advertisements and recorded messages) and 99-ADB-022 (false and misleading advertising).

. Finding no reported disciplinary cases involving facts substantially similar to the instant matter, the board analogized this case to Louisiana State Bar Ass’n v. Harrington, 585 So.2d 514 (La.1990), and In re: Wahlder, 98-2742 (La.1/15/99), 728 So.2d 837. In Harrington, the respondent was suspended from the practice of law for nine months for misconduct including, among other things, knowingly making a false statement of a material fact to a tribunal and to a third person. There, the respondent misrepresented to the court and prosecutor in a criminal proceeding that he was unaware of his client's whereabouts, when in fact he had just spoken to his client in the hallway. In Wahlder, the respondent was suspended for six months, fully deferred, for permitting his client to place the signature of the client’s wife on documents, witnessing that signature, and then attempting to prevent the client’s wife and the court from discovering the misconduct. The board felt that in all three cases, the attorneys "failed to reveal to the court and other parties to the litigation information which was significant to the outcome of the legal proceeding.”

. We believe Standard 6.12 accurately describes the heartland of respondent's misconduct:
Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.