# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #050

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **17th day of November, 2023** are as follows:

**PER CURIAM:**

1

2023-B-00344      IN RE: MARK JEFFREY NEAL

SUSPENSION IMPOSED. SEE PER CURIAM.

Weimer, C.J., concurs in part, dissents in part and assigns reasons.
Crain, J., dissents and assigns reasons.

PER CURIAM

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Mark Jeffrey Neal, an attorney licensed to practice law in Louisiana.

**UNDERLYING FACTS**

In September 2020, respondent's attorney notified the ODC that respondent had been arrested for battery. An online search produced a news report of the attack that respondent committed upon Frederick Cascio, the owner and operator of a restaurant located in Monroe, Louisiana.

By way of background, Mr. Cascio and respondent (and their families) are longtime friends. Respondent, his wife, and children visited Mr. Cascio's restaurant regularly. In the fall of 2020, respondent asked Mr. Cascio to hire his teenaged son, Noah, for a part-time job in the restaurant. Mr. Cascio agreed and hired Noah to work as a bus boy.

On the evening of September 19, 2020, Mr. Cascio believed Noah was more than an hour late for his scheduled shift. Mr. Cascio sent respondent a text message to advise that Noah had not arrived for work and to ask for his son's phone number. Respondent replied with an abusive, insulting, and racially improper text message,

which included a threat to "beat your ass."[1]  Mr. Cascio then ended the texting and returned to completing preparations for dinner service.

After completing the preparations, Mr. Cascio was conversing with his staff and sitting at a counter near the rear of the bar area.  Suddenly, respondent burst through the rear door of the restaurant in a rage.  Respondent approached Mr. Cascio, who had his leg propped up on a railing, grabbed Mr. Cascio's ankles, swiveled him around, and pulled him the length of and off the preparation counter, causing Mr. Cascio to fall onto his back and head to the concrete floor.

From there, respondent dragged Mr. Cascio into the kitchen area and knelt on his upper chest and neck.  Respondent then grabbed Mr. Cascio's head, which he repeatedly pounded into the floor, and was heard to say, "I will kill you."  The attack ended when a female employee, in an effort to pull Mr. Cascio free from respondent, reached out and grabbed Mr. Cascio as he lay on the kitchen floor.  Other employees who witnessed the attack called 911 and summoned police.  Respondent disengaged and left the premises.

During the disciplinary investigation, the ODC obtained text messages sent by respondent to Mr. Cascio on the day after the event.  In the messages, respondent asked Mr. Cascio to provide false information to police and suggest to police that

---

[1] The entirety of the text message exchange is as follows:

> Mr. Cascio:  Is Noah working tonite?  I can't find his number.  He is suppose to[.]
>
> Respondent:  You're fucking kidding me.  You don't have his fucking number?  You, your life, your family and your business is more than fucked up as a n[*]gger's checkbook. Your staff wants to quit.  You can't communicate with people and you're a manic depressive.  Your passive aggressive daughter is equally stupid[.] I'll return your documents Tuesday.
>
> Mr. Cascio: You will be ok.  Don't talk about my family.
>
> Respondent:  Fuck you.  I will come beat your ass right now.
>
> Mr. Cascio:  Whatever[.]

the attack was all a big misunderstanding. Mr. Cascio declined to offer the false information to law enforcement.

As a result of the incident, Mr. Cascio sustained injuries that required medical treatment. Mr. Cascio initiated a civil claim against respondent. In resolution of the claim, respondent paid $50,000 in general damages to Mr. Cascio and reimbursed Mr. Cascio for the $6,186 in medical expenses he incurred.

## DISCIPLINARY PROCEEDINGS

In June 2021, the ODC filed formal charges against respondent, alleging that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 8.4(a) (violation of the Rules of Professional Conduct), 8.4(b) (commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

Respondent, through counsel, answered the formal charges and admitted that he had "engaged in a physical altercation with Cascio in the restaurant," but denied that he had "asked Cascio to provide false information to the police."

Prior to a formal hearing, the parties filed joint stipulations into the record. Therein, respondent stipulated to most of the underlying facts and to violations of Rules 8.4(a) and 8.4(b).

### *Formal Hearing*

The formal hearing was conducted by the hearing committee on February 7, 2022. Both parties introduced documentary evidence. The committee heard testimony from Frederick Cascio, the complainant and victim; Karen Brownfield, a waitress at the restaurant and a witness to the event; James Honey, a deputy with the Ouachita Parish Sheriff's Office; Michael Dubos, Mr. Cascio's counsel in the civil

3

claim; John Wayley, a character witnesses for respondent; Robert Baldwin, respondent's counsel in the civil claim; and Kelly Williams, respondent's paralegal. Respondent also testified on his own behalf and on cross-examination by the ODC.

*Hearing Committee Report*

After considering the evidence and testimony presented at the hearing, the hearing committee summarized the relevant testimony as follows:

Frederick Cascio – Mr. Cascio, the victim of the attack, verified the facts and discussed his relationship with respondent's family. He also detailed the incident, his medical treatment, and the civil claim he filed against respondent. Mr. Cascio indicated that respondent's actions were "out of character," but also indicated that respondent "gets like that when he drinks." Mr. Cascio submitted that although his physical issues from the attack have since resolved, he takes "some pills" that are prescribed by a psychiatrist.

Karen Brownfield – Ms. Brownfield, a witness to the attack, testified that she observed respondent enter the back door of the restaurant, grab Mr. Cascio's ankles, and pull Mr. Cascio off the table. She described the sound of Mr. Cascio's head hitting the floor like "the thump of a melon." She observed respondent holding his knee on Mr. Cascio's chest, pushing Mr. Cascio's head into the floor, and saying to Mr. Cascio, "I will kill you." She directed others to call 911 immediately, but the attack stopped and respondent left the premises.

James Honey – Deputy Honey, with the Ouachita Parish Sheriff's Office, testified that he interviewed Mr. Cascio about the incident and then tried to contact respondent for a response before asking for a warrant. When he was unable to obtain a response, he could not determine whether respondent was being elusive. A warrant was then issued for respondent's arrest.

Michael Dubos – Mr. Dubos, the attorney hired by Mr. Cascio to file a civil claim against respondent, testified that he pursued the claim as an intentional act. Mr. Dubos stated that he obtained a settlement figure that was satisfactory to Mr. Cascio, albeit without Mr. Cascio being released from his treating physician.

John Wayley – Mr. Wayley, an attorney who has known respondent since law school, offered testimony about respondent's character and professional abilities.

Robert Baldwin – Mr. Baldwin, a partner at respondent's former law firm, represented respondent in the civil claim brought by Mr. Cascio. Mr. Baldwin stated that a settlement was agreed upon to "buy the peace." He added that based on his experiences with respondent, the incident was "totally out of character."

Respondent – Respondent stated that he has known Mr. Cascio for a long time. In addition to notarizing documents for him, respondent also helped Mr. Cascio with "technical matters," such as email, texting, saving telephone numbers, and applying for "PPP money." On the evening of the incident in question, respondent was feeling exasperated over Mr. Cascio's disorganization and failure to follow instructions. Respondent indicated that the text about his son also "irritated" him so much so that he engaged in "the most disproportionate behavior of my adult life." He added that the incident happened about three weeks after Hurricane Laura and days after he had taken testosterone shots, although the testosterone did not cause his actions. Respondent noted that he could not recall some actions detailed by Mr. Cascio. He stated:

> I have very little rational memory of a whole lot that happened thereafter other than getting in my sequoia and doing something I've never done. It was - - the term cognitive dissonance is the best thing I can describe.[2]

---

2 The committee noted that respondent does not have a diagnosis and that those words were his, not the testimony of a medical professional.

Regarding the text messages that he sent to Mr. Cascio the following day, respondent claimed he was trying to apologize and not change the facts.

Kelly Williams – Ms. Williams, respondent's paralegal, stated that Mr. Cascio was best described as respondent's friend, not a client. In the days prior to the incident, she heard respondent and Mr. Cascio talking in respondent's office, and as Mr. Cascio was leaving, respondent said something to the effect of, "Noah is your employee." She added that Noah has ADHD and respondent is protective of him.

After further considering the joint stipulations, which are generally consistent with the underlying facts set forth above, the committee found respondent violated Rules 8.4(a) and 8.4(b) of the Rules of Professional Conduct. The committee chair also found a violation of Rule 8.4(c), but did not provide reasons for this finding.

A majority of the committee did not find a violation of Rule 8.4(c) had been proven by clear and convincing evidence, but did question respondent's veracity. In his response to the complaint, he characterized the event as an accidental fall, but during his sworn statement, respondent stated he "cannot dispute" that he grabbed Mr. Cascio by the ankles and pulled him off of the counter, down onto the floor, where he hit his back and head. Respondent later stated he "had no memory" of having a knee on Mr. Cascio's chest. The testimony of Ms. Brownfield leaves no doubt the attack was initiated wholly by respondent, and was of such a nature that his look, language, and violent actions placed all concerned in great apprehension that great bodily harm, or death, would come to Mr. Cascio.

The committee determined respondent violated duties owed to Mr. Cascio, the public, the "Monroe Bar," and the legal profession. He acted knowingly and intentionally. His conduct caused physical and emotional harm to Mr. Cascio, an innocent citizen. He intimidated, embarrassed, threatened, and dominated Mr. Cascio on his own property and in the presence of his employees. The incident,

which was publicized, will doubtlessly remain a topic of public and casual conversation whenever "lawyers" are mentioned. The committee added:

> That such a thing was committed by a member of the Louisiana Bar is stunning. His actions, and the publicity, are very likely to cause great suspicion in the public dealing with lawyers, who the public views as "elites" who can avoid appropriate consequences, where the "ordinary citizen" under similar circumstances would be justly held to a more severe account.

After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined the baseline sanction is suspension.

The committee adopted the following aggravating factors, as stipulated to by the parties: vulnerability of the victim and substantial experience in the practice of law (admitted 1996). The committee adopted the following mitigating factors, as stipulated to by the parties: absence of a prior disciplinary record, imposition of other penalties, and remorse. No medical evidence was presented to explain whether respondent had any physical, mental, or emotional illnesses which may have caused his threatening and violent behavior; and no medical evidence was presented to answer the critical question of whether such a violent outburst can occur again.

Turning to the jurisprudence of this court, the committee found the actions of respondent close to those detailed in the following cases: *In re: Crabson*, 13-0312 (La. 4/12/13), 115 So. 3d 452, wherein an attorney was suspended for one year and one day, based on his conviction of simple battery following an altercation in a Walmart parking lot; *In re: Cardenas*, 11-0031 (La. 5/6/11), 60 So. 3d 609, wherein an attorney was suspended for one year, with six months deferred, based on his conviction of domestic abuse battery for striking his estranged wife in the presence of their minor child; *In re: Willis*, 09-0211 (La. 5/13/09), 8 So. 3d 548, wherein an attorney was disbarred for serious misconduct including charges for two counts of simple battery arising out of an altercation with his girlfriend at a drive-up window of a fast food restaurant; and *In re: Sterling*, 08-2399 (La. 1/30/09), 2 So. 3d 408,

wherein an attorney was suspended for two years for serious misconduct including his conviction of unauthorized entry of his girlfriend's apartment.

The committee also stated:

> The vile, obscene threats and the sudden, unprovoked attack which Respondent inflicted upon Mr. Cascio, in his restaurant and in the presence of his employees, placed them all in serious and immediate apprehension of violent harm, and death to their boss. That must place this matter far beyond the fuss and feathers bluster of feuding egos in a courthouse or at a deposition. The actions of Respondent toward Mr. Cascio were not "minor" in any sense. Whether Mr. Cascio was a "client" of Respondent is of no moment. Respondent's actions, in response to an innocuous text, were simply reprehensible, regardless of who received such treatment. The sanction imposed, must of necessity reasonably correspond with the gravity of the misconduct. While Respondent does exhibit remorse, his texts, violence, and death threat, are simply overcoming to his regret months later.
>
> To treat this matter as being appropriately resolved with a "time out" in a figurative penalty box before going back into the game, does not do justice to Mr. Cascio, to the public, or to the legal profession. This was a moral and ethical failure by Respondent, personally and professionally. His actions violate the hallmarks of conduct for any member of the Louisiana Bar.
>
> The issue for the committee, considering the facts, is what is the appropriate sanction, considering the stated intent of Respondent, the harm resulting from his actions, and the context in which the conduct occurred? Considering respondent's lack of disciplinary history, and his remorse, we find it difficult to arrive at a consensus of a sanction which is both responsive to respondent's current misconduct and which will protect the public in the future. He should be required to demonstrate fitness, with convincing medical evidence, that such behavior will never be repeated. *In Re LaMartina* 2010 B 0093 (La. 7/2/2010) 30 So. 3d 266.

After further considering this court's prior jurisprudence addressing similar misconduct, the committee recommended that respondent be suspended from the practice of law for one year and one day, with all but sixty days deferred, subject to a two-year period of probation with the following conditions:

8

1. Prior to reinstatement, respondent shall be evaluated by a mental health professional to determine any underlying mental and/or emotional condition may cause violent conduct, and the evaluation shall include a drug/alcohol use assessment and the need for further anger management;

2. Within thirty days of the finality of the court's judgment, respondent shall submit to an examination by a licensed mental health care professional, approved by the ODC, and comply with any plan of treatment prescribed by that professional, at respondent's cost;

3. Respondent shall further advise the ODC of the results of the examination as well as the recommended treatment, if treatment is ordered by the mental health care professional, and shall provide the ODC with medical records to the ODC upon its request; and

4. If treatment is ordered, respondent shall provide the ODC with monthly reports from the mental health care professional to ensure he complies with treatment. In the event respondent fails to comply with these conditions, or if he engages in any misconduct during the period of probation, the deferred suspension may become executory, or additional discipline may be imposed, as appropriate.

The committee further recommended that respondent be assessed with the costs and expenses of these disciplinary proceedings.

The committee chair dissented, stating:

> While I agree with the vast majority of the findings and conclusions of the majority, I dissent on the following two points. First, I believe there is clear and convincing evidence that Respondent violated Rule 8.4(c). Second, I would recommend that Respondent be suspended from the practice of law for one year and one day with NO period of deferral, which would require a petition for reinstatement pursuant to the Louisiana Supreme Court Rule XIX, Section 24.

9

The lawyer member concurred with the recommended sanction and imposed conditions but dissented insofar as he disagreed with some of the language in the committee's report and "the derived implications of the committee's findings."

The ODC filed an objection to the committee's recommendation.

*Disciplinary Board Recommendation*

After review, the board found that the hearing committee's factual findings are manifestly erroneous in three minor instances,[3] but adopted all other factual findings. The board also made the following additional findings of fact:

The State deferred respondent's prosecution in exchange for his entering into a pre-trial diversion program, which included anger management classes (a three-hour online course). After completing the program, the district attorney dropped all prosecution and agreed not to pursue criminal charges. Although he was never convicted of a crime, respondent admitted that he is guilty of the crime of simple battery. Mr. Cascio sustained physical injuries, primarily in the form of neck and back soft tissue injuries, as well as emotional trauma.

The board acknowledged that respondent stipulated to violating Rules 8.4(a) and 8.4(b), and noted the stipulations must be given effect unless they are withdrawn. *See In re: Torry*, 10-0837 (La. 10/19/10), 48 So. 3d 1038. The board adopted the committee's finding that the ODC did not prove a violation of Rule 8.4(c) by clear and convincing evidence.

The board indicated that the committee conducted its assessment of whether respondent violated Rule 8.4(c) based on his change in account of Mr. Cascio's fall. Respondent initially characterized the fall as accidental, but later admitted that he

---

[3] The board corrected three minor mistakes: (1) the committee's finding that respondent grabbed Mr. Cascio off of a table (it was a countertop); (2) the committee's finding that the doctor who prescribed testosterone to respondent was alive (he's deceased); and (3) the lawyer member's finding that Hurricane Ida struck days before respondent's misconduct (it was Hurricane Laura).

fall was caused by his intentional actions. During the hearing, respondent explained the change in his account:

> That was in a statement – and or that was in a letter, right? That was in that initial letter? That was my recollection. And, apparently, that is not what other people saw. And I'm not in a position to dispute that. No matter what, I pulled him from the table or reached for him. I am the reason that he fell. My behavior caused him to fall. And I'm the one that pulled him by the legs, by his ankles approximately ten feet to a resting spot.

The board noted the committee's finding is apparently based on respondent's initial recollection that the fall was accidental, and then, later, without reservation, changed his story based on the observations of others who were present. Like the committee, the board determined that this conduct does not involve dishonesty, fraud, deceit, or misrepresentation.

Next, the board indicated that the ODC based its allegation that respondent violated Rule 8.4(c) on the following: On direct examination, Mr. Cascio confirmed that respondent suggested in a text message that he (Mr. Cascio) tell police that the attack was a misunderstanding, so when he filed his complaint, Mr. Cascio believed it was respondent's intent to ask him to tell police an untruth. While under cross-examination, however, Mr. Cascio testified that respondent was stating that he (respondent) would tell the police about the attack, and not suggesting what Mr. Cascio should tell police.

The board indicated that despite Mr. Cascio's changing testimony, the parties' stipulations on this issue were not withdrawn and must be given effect. The stipulations are as follows: (1) the ODC obtained text messages in which respondent asked Mr. Cascio to advise police the attack was all a misunderstanding; and (2) Mr. Cascio declined to offer what he believed to be inaccurate information to law enforcement. The board noted that although respondent's suggestion to Mr. Cascio that he characterize the incident as a "misunderstanding" and "mistake" to police

11

was perhaps self-serving, it did not rise to a level of conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(c).

The board determined that respondent violated duties owed to Mr. Cascio, personally, the public, the Monroe Bar, and the legal profession. His actions were knowing and intentional. He caused personal physical and emotional harm to Mr. Cascio, an innocent citizen. His intent was to harm Mr. Cascio. In fact, respondent stipulated that he sent Mr. Cascio an abusive, insulting, and improper text message, which included a threat to "beat your ass." Respondent carried through with his threat by physically attacking Mr. Cascio, while threatening to kill him. Respondent also tarnished the reputation of the legal profession.

After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the board determined the baseline sanction is suspension. The board determined the following aggravating factors are present: vulnerability of the victim, substantial experience in the practice of law (admitted 1996), and illegal conduct. The board determined the following mitigating factors are present: absence of a prior disciplinary record, timely good faith effort to make restitution or to rectify consequences of misconduct, imposition of other penalties, and remorse. Although respondent claimed that he had received a shot of testosterone three days prior to the incident, he also indicated that the shot did not cause him to attack Mr. Cascio.

Of the cases cited by the committee, the board found this matter most in line with *Crabson*, wherein an attorney also committed simple battery – an unexpected attack – on a member of the public. As in the instant matter, the attack did not occur within the context of practicing law. Like Mr. Crabson, respondent had an extreme reaction to a relatively minor incident, which not only calls into question his fitness to practice law, but could also be an indicator of his inability to handle himself professionally in stressful or difficult circumstances while practicing law.

The board determined that the sanction of a one year and one day suspension, as imposed in *Crabson*, is therefore appropriate for this matter. However, given the significant mitigating factors present, most of which were not present in *Crabson*, the board also recommended that six months of the suspension be deferred.

Accordingly, the board recommended that respondent be suspended from the practice of law for one year and one day, with six months deferred, with a two-year period of probation with the following conditions:

1. Upon finality of the court's judgment, respondent shall be ordered to consult with Judges and Lawyers Assistance Program ("JLAP") in order to be evaluated by a JLAP-designated licensed mental health care professional to determine any underlying mental and/or emotional condition that may cause violent conduct. This evaluation shall include a drug/alcohol assessment and the need for further anger management counseling. Respondent shall also be subject to the following conditions concerning this evaluation and any recommended treatment:

   a. Within thirty days of the finality of the court's judgment, respondent shall submit to the evaluation by the JLAP-designated licensed mental health care professional and begin compliance with any plan of treatment prescribed by that professional, at respondent's cost;

   b. Respondent shall further advise JLAP and the ODC of the results of the evaluation as well as any recommended treatment, and shall provide his medical records to JLAP and the ODC upon their request

   c. If treatment is ordered, respondent shall provide JLAP and the ODC with monthly reports from the licensed mental health care professional to ensure he complies with treatment;

2. In the event respondent fails to comply with these conditions, or if he engages in any misconduct during the period of probation, the deferred suspension may become executory, or additional discipline may be imposed, as appropriate; and

3. Respondent must be in compliance with the above conditions prior to his reinstatement to the practice of law.

The board further recommended that respondent be assessed with the costs and expenses of these disciplinary proceedings.

One board member concurred with the recommendations of the majority but noted that emphasis should be placed on respondent's compliance with all of the conditions prior to being allowed to practice law again.

Three board members dissented for the reasons provided in the committee chair's dissenting opinion, finding that respondent violated Rule 8.4(c), and they would not defer any portion of the suspension.

Respondent filed an objection to the board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

## DISCUSSION

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

The events of September 19, 2020 are not in dispute, having been stipulated to by the parties. Respondent acknowledges that he physically attacked a restaurant owner at his place of business after the owner contacted respondent to inquire about

14

the whereabouts of respondent's son who worked at the restaurant as a bus boy and was late in reporting for his shift. The parties have also stipulated, and the evidence supports, that respondent violated Rules 8.4(a) and 8.4(b) of the Rules of Professional Conduct. We do not find that a violation of Rule 8.4(c) has been proven by clear and convincing evidence.

Respondent violated duties owed to the public and the legal profession. His actions were intentional, and caused physical and emotional harm to Mr. Cascio. His actions also created the potential for even more serious injuries, or even death, to Mr. Cascio. Respondent's actions also caused harm to the public, who witnessed the violent attack, and to the reputation of the legal profession. The applicable baseline sanction in this matter is suspension. The aggravating and mitigating factors found by the disciplinary board are supported by the record.

Considering these findings, we agree that the sanction recommended by the board is appropriate. Accordingly, we will suspend respondent from the practice of law for one year and one day, with six months deferred, followed by a two-year period of probation governed by the conditions set forth by the board.

**DECREE**

Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Mark Jeffrey Neal, Louisiana Bar Roll number 24580, be and he hereby is suspended from the practice of law for a period of one year and one day. It is further ordered that six months of this suspension shall be deferred. Following the completion of the active portion of his suspension, respondent shall be placed on probation for a period of two years governed by the conditions recommended by the disciplinary board. Any failure of respondent to comply with the conditions of probation, or any misconduct during the probationary period, may be grounds for

15

making the deferred portion of the suspension executory, or imposing additional discipline, as appropriate. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

# SUPREME COURT OF LOUISIANA

## NO.   2023-B-0344

## IN RE: MARK JEFFREY NEAL

*ATTORNEY DISCIPLINARY PROCEEDING*

**WEIMER, C. J.**, concurring in part and dissenting in part.

I concur in the majority's conclusion that respondent violated Rules 8.4(a) and 8.4(b) of the Rules of Professional Conduct and that the baseline sanction in this matter is suspension.  Where I depart from my colleagues is in the length of the suspension imposed.  Based on the original text sent to the victim, which is quoted at footnote 1 of the per curiam,[1] and on the lack of candor in respondent's initial response to the Office of Disciplinary Counsel, I would impose a lengthier period of actual suspension.

---

[1]**In re: Mark Jeffrey Neal,** 23-0344 (La. 11/__/23), slip op. at 2, n.1

# SUPREME COURT OF LOUISIANA

## No. 2023-B-00344

## IN RE: MARK JEFFREY NEAL

Attorney Disciplinary Proceeding

**CRAIN, J., dissents and assigns reasons.**

I dissent, finding the discipline too lenient.