930 So.2d 916 (2006)
In re Pressley C. CALAHAN.
No. 2006-B-0005.
Supreme Court of Louisiana.
May 17, 2006.
*919 Charles B. Plattsmier, Baton Rouge, Shana M. Broussard for applicant.
P. Charles Calahan, New Iberia, for respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Pressley Charles Calahan, an attorney licensed to practice law in Louisiana.

UNDERLYING FACTS AND PROCEDURAL HISTORY
The ODC filed two sets of formal charges against respondent. The first set, bearing the disciplinary board's docket number 02-DB-032, was filed on March 28, 2002 and encompasses two counts of misconduct. The second set, bearing the disciplinary board's docket number 04-DB-029, was filed on March 26, 2004 and originally encompassed five counts of misconduct.[1] The two sets of formal charges were considered by separate hearing committees, then consolidated by the disciplinary board pursuant to an order of this court rendered on July 29, 2004. In re: Calahan, 03-3260 (La.7/29/04), ___ So.2d ___. On January 3, 2006, the disciplinary board filed in this court a single recommendation of discipline encompassing both sets of formal charges.

02-DB-032

Count I  The Hebert Matter
David Hebert retained an attorney to represent him in a maritime personal injury case. When the case settled in the fall of 1998, Mr. Hebert paid attorney's fees of more than $36,000. Believing this sum to be excessive, Mr. Hebert retained respondent in late September 2000 to assist him in recovering a portion of the fee. Respondent *920 informed Mr. Hebert that his fee in such matters customarily ranged from 40%-50% of the amount recovered, and he presented Mr. Hebert with a contingent fee agreement to that effect. However, Mr. Hebert refused to sign the agreement, as he understood from prior discussions with respondent that the fee would be based upon an hourly rate. On October 2, 2000, respondent faxed Mr. Hebert's former attorney a one-page letter demanding the return of the excessive legal fee:
Pursuant to 33 USC § 928, your legal fee in the LHWCA claim . . . is limited to $6,066.27. Any withholding in excess of that amount is a violation of 33 USC § 928(e) and LSBA Rules of Professional Conduct Rule 1.5. You withheld $36,666.67 including expenses that I intend to audit. Please refund $30,000 to this office within five (5) days or I will undertake the appropriate action for recovery, etc.
On October 4, 2000, two days after receiving respondent's letter, the attorney refunded $30,000 to respondent on Mr. Hebert's behalf. Respondent paid $17,500 to Mr. Hebert by check drawn on his client trust account dated October 5, 2000, and retained $12,500 as his attorney's fee. Though Mr. Hebert had specifically refused to sign a contingent fee agreement in connection with respondent's representation, the legal fee that respondent collected was approximately 40% of the amount he recovered. Mr. Hebert subsequently retained new counsel and filed both a disciplinary complaint and a civil suit against respondent with respect to the $12,500 fee.
Throughout the disciplinary proceeding and the civil litigation, respondent has offered different explanations of his fee arrangement with Mr. Hebert. For example, in a response to the disciplinary complaint dated January 4, 2001, respondent asserted that his fee was not based upon "a contingency percentage," but rather was "a negotiated fee agreed to by Mr. Hebert and myself." Respondent stated that the $12,500 fee was in his view reasonable and fully earned, considering "the unusual nature" of the case and his "unique experience in the area," the degree of risk involved in the representation, the "unexpectedly high and beneficial results" to Mr. Hebert, and the fact that he had declined other representation to take and investigate the case. Respondent admitted that he kept no time sheets in connection with the representation.
On the other hand, in the civil suit filed by Mr. Hebert, respondent contended that the parties had a contingent fee agreement based upon an oral contract. Respondent also specifically denied Mr. Hebert's allegation that an hourly fee arrangement existed. Nevertheless, when the civil case proceeded to trial in May 2002, respondent introduced a "reconstruction" of his "hourly involvement" in Mr. Hebert's legal matter, claiming that he devoted 81 hours to recovering the excessive legal fee.[2]
Based on the evidence presented in the civil case, the trial court concluded there was no contingent fee agreement between *921 respondent and Mr. Hebert. The court also found that respondent's $12,500 fee was excessive. The court rejected the "reconstructed" time sheet prepared by respondent and found that respondent performed services for Mr. Hebert in the range of four to five hours, for which an appropriate fee would be $1,000. Accordingly, the court awarded that sum to respondent, and awarded Mr. Hebert the sum of $11,500, plus legal interest and costs.[3]
In August 2002, while the judgment in the civil case was on appeal, a formal hearing was conducted in respondent's disciplinary proceeding. In his opening statement, respondent told the hearing committee that although he has always believed he had a contingent fee arrangement with Mr. Hebert, "the Court has ruled that it is not, and my contention right now, it is not. It was based on the number of hours." Respondent further asserted that "the number of hours I don't think are much in contention."
In its formal charges, the ODC alleged that respondent's conduct violated Rules 1.5 (fee arrangements) and 8.4(a) (violation of the Rules of Professional Conduct) of the Rules of Professional Conduct. The ODC further alleged that respondent failed to report the misconduct of Mr. Hebert's former attorney (charging an excessive fee in the maritime personal injury case), in violation of Rule 8.3(a).
Respondent answered the formal charges and denied any misconduct in handling the Hebert matter. Pointing out that the civil case was then still in litigation, respondent stated that the basis of the fee was always clear to Mr. Hebert; that a contingent fee contract was in writing but simply not signed, which contract "became a negotiated fee based on hours expended and results obtained"; and that he was unaware of any misconduct by counsel that he might have reported to the ODC.
At the hearing on the formal charges, Mr. Hebert testified that respondent initially told him that he would charge $100 to $150 per hour to write a demand letter to his first attorney. Respondent later requested that Mr. Hebert sign a contingent fee agreement in connection with this endeavor, but Mr. Hebert declined to do so, emphatically telling respondent that he would not pay him 40% simply to write a letter. Respondent then told Mr. Hebert that they would "negotiate a price later." A few days later, after the settlement was received, respondent gave Mr. Hebert a check for $17,500, telling him it was his "take." The conversation between Mr. Hebert and respondent continued:
I says, "We didn't even negotiate a price." I said, "What's yours?" He says, "Forty percent, twelve-five." I says, "No. No. I did not agree on that at all. I'm very unhappy, you know, with that. No." And wehe had just calmly told me, "Look, David, if you have a problem with that, you know, you just got to do what you got to do, . . ."
Within two weeks of receiving the $17,500 check, Mr. Hebert filed a complaint against respondent with the ODC. In response to the questions of a hearing committee member, Mr. Hebert denied that respondent ever explained the basis of the $12,500 fee he charged. Mr. Hebert testified that all respondent ever said was that "it's just like drilling an oil well or something *922 like that, you know. You're going toone's got to pay for the other, you know."[4]

Count IIThe Payton Matter
On October 23, 2001, Lea Payton met with respondent to discuss her recent separation from her husband. Ms. Payton sought respondent's advice because her husband had threatened to disconnect the utilities in the family home, and she was concerned that her husband might attempt to dispose of community assets. Respondent asked Ms. Payton whether she had been physically abused by her husband, which she absolutely denied. Respondent then recommended that Ms. Payton file for divorce and seek a restraining order to prevent her husband from selling any of their property. Ms. Payton agreed to this course of action.
Following the meeting, Ms. Payton telephoned respondent's office on several occasions to inquire when she should come back to "sign the papers." Respondent initially told Ms. Payton the pleadings were not ready, but on October 29, 2001, he filed a petition for divorce on her behalf. Respondent did not afford Ms. Payton the opportunity to review and sign the pleading before it was filed, nor did he provide her with a copy of the pleading upon filing. Unbeknownst to Ms. Payton, the petition included allegations that she had been harassed and physically abused by her husband, and that she feared harassment and sexual or physical abuse during the pendency of the proceedings.[5] An "Affidavit of Plaintiff" was attached to the petition, purportedly signed by Ms. Payton, attesting "that all of the allegations of fact contained [in the petition for divorce] are true and correct to the best of her information, knowledge and belief." The affidavit was notarized by respondent.
On October 31, 2001, the trial court issued a temporary restraining order prohibiting Mr. Payton from "disposing of or encumbering any or all of the property owned in community by Plaintiff and Defendant until further order of this Court, and from harassing or sexually or physically abusing Plaintiff." In mid-November 2001, Ms. Payton finally obtained a copy of the petition filed by respondent and discovered the false allegations of sexual and physical abuse by her husband. Ms. Payton also observed that her signature had been forged on the affidavit verifying the truthfulness of the factual allegations contained in the petition for divorce.
Ms. Payton confronted respondent immediately about her concerns. Respondent informed Ms. Payton that he included *923 the allegations of sexual and physical abuse in the petition for divorce because that is "standard wording in a restraining order." Concerning the forged signature on the affidavit, respondent told Ms. Payton, "I have no idea who signed that." At Ms. Payton's request, the trial court dismissed her petition for divorce on November 28, 2001.
In December 2001, Ms. Payton filed a complaint against respondent with the ODC, stating that her signature was forged on the affidavit and recounting her husband's reaction "to the lies I told in the divorce papers." In his reply to the complaint, dated January 9, 2002, respondent stated:
As you can surmise Ms. Payton is an emotionally disturbed woman who has suffered considerable mental abuse from her husband. The divorce action was explained to her and she agreed to its contents, purposes, allegations, and objectives. She called several times a day after our first meeting wanting to expedite the filing and service as she was eager to divorce her husband and be rid of his abuse. . . . Unfortunately, she is so dependent that even the slightest resistance is met with retaliation and causes her to be made to feel at fault.
The petition was a boiler plate Civil Code 102 Divorce with restraining orders. It did not contain an allegation of sexual abuse but rather requested a temporary restraining order to deter its potential. Mr. Payton has made Ms. Payton feel so guilty that now she is begging for reconciliation. She is in serious need of professional counseling for her emotional stability. I wish her well and hope that she is able to realize the real cause of her problem.
By letter dated January 18, 2002, the ODC asked respondent for a response to Ms. Payton's allegation that she did not sign the affidavit filed with the petition for divorce. On January 22, 2002, respondent stated:
Louisiana Code of Civil Procedure Article 3951 requires that the petition in a Divorce pursuant to Louisiana Civil Code Article 102 be verified by affidavit. To the best of my knowledge Mrs. Payton authorized her signature on the affidavit. [emphasis added]
The ODC then asked respondent to clarify whether he did, in fact, sign Ms. Payton's signature on the affidavit. In a January 28, 2002 response, respondent finally admitted that he signed Ms. Payton's name to the affidavit, notarized it, and filed it into the court record:
In my letter of January 22, 2002 I stated that Mrs. Payton's signature on the verification was authorized. I would not have filed the affidavit unless she specifically authorized it. . . . With the numerous calls that came to the office insisting that divorce papers be filed immediately, it appears that I did indeed sign her name as requested. [emphasis added]
In its formal charges, the ODC alleged that respondent's conduct violated Rules 1.2(a) (scope of the representation), 1.4 (failure to communicate with a client), 3.3(a)(1) (making a false statement of material fact or law to a tribunal), 4.1 (truthfulness in statements to others), 8.4(a), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration of justice) of the Rules of Professional Conduct.
Respondent answered the formal charges and denied any misconduct. Specifically, he stated that Ms. Payton demanded the immediate filing of the petition for divorce, thereby waiving the opportunity to review it, and that she "authorized the notarization of the affidavit."
*924 At the hearing on the formal charges, Ms. Payton testified that she did not authorize respondent to sign the affidavit on her behalf, nor did he ever seek her permission to do so. For his part, respondent denied that it was deceitful to forge Ms. Payton's signature on the affidavit. When asked whether he had an obligation as an officer of the court not to forge his client's signature on a pleading, he said: "I happen to know that others do it, and I don't pass any judgment on it. I think it's a matter of convenience to the client and to the court system."

Hearing Committee Recommendation
In Count I, the Hebert matter, the hearing committee found that respondent attempted to enforce a contingent fee against his former client, but when it became apparent that effort was failing, he shifted his argument to an hourly arrangement in an attempt to justify the fee. Respondent's reconstructed time records reflect 81 hours, which would have supported the $12,500 fee if truly spent on the case. However, the committee found respondent was not credible in his assertion that he spent 81 hours working on Mr. Hebert's case. The committee determined that respondent worked no more than five to ten hours in the matter, and that the $12,500 fee was excessive. Based on these factual findings, the committee found that respondent charged an unreasonable fee, in violation of Rules 1.5(a) and 8.4(a). Respondent also violated Rule 1.5(b) by failing to communicate whether the fee was to be a contingent fee or an hourly fee, and violated Rule 1.5(c) by failing to have a contingent fee agreement in writing. Respondent produced a written contingent fee agreement that Mr. Hebert refused to sign, but respondent nevertheless proceeded to collect his fee and defend the suit against him on the basis that a contingent fee contract was in place. The committee stated:
The matter started with an attempt by Respondent to negotiate a contingent fee. He submitted a proposed contract to his client, who refused to sign it. There was discussion about possible hourly fees, and even the Respondent admits that the fee was "to be negotiated later," though he now claims that what he meant was that the negotiation would determine whether the fee was to be 40% or 50% or somewhere in between. He now argues that because the Judge ruled that there was no contingency fee contract he has not violated the rule requiring the contract to be in writing. He has also argued that it was in writing, though not signed. The Committee believes that the Respondent's arguments are specious. Without a doubt, the arrangement was unclear, and the fault lies with the Respondent who tried (and is still trying in the Appeal Court) to enforce the contingent fee. The rule says that a contingent fee agreement must be in writing. In this Committee's opinion, it is not the failure to obtain the signed contract which is the violation here, rather, it is the attempt by the Respondent to charge a contingent fee after the client refused to sign the proposed contract.
The committee also found that respondent failed to report the professional misconduct of another lawyer, in violation of Rule 8.3(a), given that respondent's October 2, 2000 letter suggested that Mr. Hebert's former attorney had withheld an excessive fee in violation of the Rules of Professional Conduct.
In Count II, the Payton matter, the committee found that Ms. Payton retained respondent seeking a divorce from her husband. In the initial consultation, there was some discussion about whether a temporary restraining order was needed to prevent physical abuse, and Ms. Payton said that was unnecessary because her *925 husband had not mistreated her in that way. Nevertheless, respondent drew up a petition alleging harassment and sexual and physical abuse.[6] Respondent filed the petition without his client's prior review and attached an affidavit to obtain the temporary restraining order requested in the petition. The affidavit was purportedly signed by "Lea Payton," and notarized by respondent. When Ms. Payton obtained a copy of the papers from the court and contacted respondent, complaining about what he had done, respondent said, "I have no idea who signed that." Then, instead of admitting his misconduct in response to the complaint filed by Ms. Payton, respondent blamed Ms. Payton and alleged that she is an "emotionally disturbed woman." Later, when given another opportunity to respond, he said that Ms. Payton "authorized her signature on the Affidavit." It was only in response to the ODC's direct question ("Did you sign Mrs. Payton's signature on the Affidavit?") that respondent admitted, "It appears that I did indeed sign her name as requested." Likewise, at the hearing, respondent admitted that he affixed Ms. Payton's signature to the affidavit, and then notarized that signature.
Based on these factual findings, the committee determined that the formal charges in Count II were proven by clear and convincing evidence. Respondent violated Rule 1.2(a) by filing a divorce petition containing an allegation of physical abuse despite the client's express request not to do so. Respondent violated Rule 1.4 by failing to inform his client that he filed the petition for divorce; respondent should have required Ms. Payton to review the petition and sign her own affidavit before filing the pleadings into the court record. Finally, respondent violated Rules 3.3(a)(1), 4.1, 8.4(a), 8.4(c), and 8.4(d) by submitting to the court a petition purporting to be verified by an affidavit of the plaintiff. With respect to these violations, the committee stated:
The Respondent himself affixed his client's signature on the affidavit and then pretended to notarize the client's signature. Even if the Respondent's assertion that Mrs. Payton authorized him to sign her name to the affidavit is true (which the Committee does not believe is the case), the notarization itself certifies that Mrs. Payton personally appeared, swore to and subscribed the document, and that certification is simply untrue, and has been admitted by Respondent. Respondent also violated Rule 8.4(d). The untruthful certification was prejudicial to the administration of justice because it resulted in the issuance of a temporary restraining order against Mr. Payton which would not have otherwise issued. Respondent also violated Rule 4.1, requiring truthfulness in statements to others. When questioned by his client after she had obtained the affidavit from the Courthouse, Respondent did not state truthfully what he had done. Rather, he claimed that he didn't know how it happened. The Respondent has been deceitful in this matter, and the Committee believes that Rule 8.4(c) was also violated.
The committee determined that respondent violated duties owed to his clients and to the legal system. The committee observed that a wide range of sanctions from public reprimand to disbarment may potentially be applicable to the excessive fee violations in Count I. Considering this fact, the committee focused on the conduct in Count II in assessing an appropriate sanction. The committee noted four cases which involve misconduct similar to respondent's, namely In re: Wahlder, 98-2742 *926 (La.1/15/99), 728 So.2d 837 (a fully deferred six-month suspension with probation imposed upon an attorney who permitted a client to sign his wife's name to settlement documents, then witnessed the wife's signature as if she had appeared before the lawyer; significant mitigating factors present, including lack of dishonest or selfish motive and timely good faith efforts to rectify the consequences of the misconduct); In re: Hensley, 96-0425 (La.9/13/96), 679 So.2d 384 (a six-month suspension imposed upon an attorney who probated a will forged by her client; several mitigating factors present, including remorse); In re: Stephens, 94-1924 (La.11/18/94), 645 So.2d 1133 (an eighteen-month suspension imposed upon an attorney who notarized a forged affidavit and then filed it into the court record; the attorney had a prior disciplinary history consisting of a one-year suspension imposed in 1993); and Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992) (an eighteen-month suspension imposed upon an attorney who executed a false affidavit; the attorney had a prior disciplinary history consisting of a reprimand and a nine-month suspension imposed in 1988). The committee noted that respondent has not previously been suspended, as in Stephens and Boutall, but unlike Hensley and Wahlder, the committee found no remorse on respondent's part.
The committee recognized the following aggravating factors: respondent's prior disciplinary offenses,[7] a dishonest or selfish motive, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victims, and substantial experience in the practice of law (admitted 1990). The committee found no mitigating factors are present.
Under these circumstances, the committee recommended that respondent be suspended from the practice of law for nine months, followed by a one-year period of probation subject to specified conditions.
Both respondent and the ODC filed objections to the hearing committee's report and recommendation in 02-DB-032. The ODC argued that the sanction recommended by the committee is too lenient. Respondent did not address the appropriateness of the sanction, but agreed with the committee's findings of violations of Rules 1.5(a) and (b) in Count I and Rules 1.2(a), 1.4, and 8.4(d) in Count II. Respondent also admitted in his objection that it was his fault the fee agreement with Mr. Hebert was not in writing, and that signing Ms. Payton's signature and notarizing it was "a mistake and error in judgment."

04-DB-029

Count IThe Judiciary Commission Matter
In March 2002, respondent submitted a complaint alleging judicial misconduct to the Judiciary Commission of Louisiana. Pursuant to Supreme Court Rule XXIII, § 23, "All documents filed with, and evidence and proceedings before the judiciary commission are confidential." Nevertheless, during a hearing in open court in April 2002 in connection with a motion to recuse the judge subject of the complaint, respondent referred to the complaint on the record, including its file number, and noted that the complaint was "active."[8]
*927 The ODC was notified of the public disclosure of the complaint and thereafter sought a response from respondent. By letter dated February 10, 2003, respondent denied any misconduct. Specifically, respondent stated that "neither the basis, nor any of the documents or evidence regarding the complaint . . . were disclosed and there was no advice [from] the Judiciary Commission that even the mere existence of the complaint was to be confidential."
In its formal charges, the ODC alleged that respondent's conduct violated Rules 8.4(a) and 8.4(d) of the Rules of Professional Conduct, as well as Supreme Court Rule XXIII, § 23, relating to the confidentiality of Judiciary Commission proceedings. Respondent answered the formal charges and denied any misconduct.

Count IIIThe Temple Matter
In January 1996, respondent filed suit on behalf of the plaintiffs in the matter entitled Charlene Davis, as natural tutrix and administratrix of the estate of her minor child, Ramona Davis v. City of New Iberia, et al., No. 83,385 on the docket of the 16th Judicial District Court for the Parish of Iberia. The suit alleged that the City of New Iberia was liable to the plaintiffs for the injuries Ramona Davis sustained when she was shot by James "Boo Boo" Chargois, a convicted felon who was then on probation in connection with an unrelated crime. The suit further alleged that the City of New Iberia was negligent in failing to arrest Mr. Chargois prior to the shooting in response to Ms. Davis' repeated complaints of harassment by Mr. Chargois. In respondent's pre-trial memorandum, he asserted that the New Iberia Police Department (NIPD) investigated several of these incidents, but never arrested Mr. Chargois because Sergeant Colleen Temple of the NIPD "had a special relationship with James `Boo Boo' Chargois, which may have included sexual intimacy." [emphasis in original] On February 23, 1999 and February 24, 1999, the local newspaper, The Daily Iberian, printed these allegations, quoting the pre-trial memorandum and an interview with respondent.
When the Davis case proceeded to a jury trial on February 26, 1999, both Mr. Chargois and Sergeant Temple testified that there had never been any sexual relationship between them. Respondent subsequently admitted to defense counsel and a reporter for The Daily Iberian that there was no proof such a relationship had ever existed.
In July 1999, Sergeant Temple filed a defamation suit against respondent. Temple v. Calahan, No. 91,569 on the docket of the 16th Judicial District Court for the Parish of Iberia. The suit claimed that respondent's allegation of a special relationship between Sergeant Temple and a convicted felon, which may have included sexual intimacy, was defamatory. Following a trial in May 2001, the trial court determined that respondent's statements about Sergeant Temple were false and defamatory and made with actual malice. The judge specifically observed in his written reasons for judgment that respondent's testimony at trial was not credible and was, "in many respects, unbelievable." The court awarded judgment in Sergeant Temple's favor in the amount of $10,000.[9]
In November 2001, Sergeant Temple's attorney, John F. Wilkes, III, filed a complaint *928 against respondent with the ODC and attached the reasons for judgment in the Temple case. Respondent answered the complaint but did not address the substantive issues it raised.
In its formal charges, the ODC alleged that respondent's conduct violated Rules 3.1 (meritorious claims and contentions), 3.3, 8.4(a), 8.4(c), and 8.4(d) of the Rules of Professional Conduct. Respondent answered the formal charges and denied any misconduct.
At the hearing on the formal charges, Mr. Wilkes testified that during a break in the Davis case, he told respondent, "I can't believe you said that about Colleen." Respondent laughed in response and said there was never any evidence that Sergeant Temple was sleeping with Mr. Chargois. Mr. Wilkes discussed the matter with Sergeant Temple and subsequently agreed to represent her in a defamation suit against respondent.
According to respondent, there was evidence of a relationship between Mr. Chargois and Sergeant Temple; however, the evidence ultimately did not "mature into proof." Respondent explained that a friend of the Davis family, Hasan Omar Shariff, testified in a deposition that Mr. Chargois had bragged of having a sexual relationship with a white female police officer. While Mr. Shariff repeatedly declined to identify Sergeant Temple as the officer in question, respondent testified that Mr. Shariff had given him additional information "off the record" and outside the deposition which led him to believe "that one of the reasons that Mr. Chargois was not arrested was because of a relationship with Colleen Temple, the police officer." Mr. Shariff then "disappeared" and was unavailable to testify at the trial in the Davis case, so respondent was unable to prove the allegation he made in the pre-trial memorandum. Respondent also pointed out that he said in the memorandum that a sexual relationship "may" have existed between Sergeant Temple and Mr. Chargois, which he contended is "an expression of opinion" for a jury to evaluate in light of the evidence, not a statement that the relationship actually existed.
In any event, respondent denied making any knowingly false statements about Sergeant Temple, and he contended that the trial judge's finding to that effect is "wrong." Respondent also contended that some of the credibility findings in the written reasons for judgment "are just plain false." After the reasons for judgment were rendered, respondent filed a complaint against the trial judge with the Judiciary Commission.[10] He also filed a defamation suit against the judge. Respondent testified that he decided not to pursue the defamation suit after the court of appeal affirmed the trial court's ruling in the Temple case.

Count IVThe Racheau Matter
In February 2001, Brandon Racheau and his fourteen-year old brother, Matthew, were involved in an automobile accident. In March 2001, Brandon, who was of the age of majority, retained respondent to represent him in a claim for damages arising out of the accident. The contingent fee agreement that Brandon signed also purported to cover Matthew's claim for damages; however, Matthew's mother, Tammy Racheau, did not sign the agreement or otherwise consent to respondent's representation of Matthew before the representation commenced.
In July 2001, respondent settled Matthew's personal injury claim for $8,500. *929 Ms. Racheau did not consent to the settlement before it was negotiated, and she did not endorse the settlement check, although she was a payee.[11] However, Ms. Racheau did sign the pleadings seeking court approval of the minor's settlement. These pleadings referred to a disbursement statement, which was not attached, but which reflected that respondent retained one-third of Matthew's settlement ($2,833.34) as his attorney's fee, disbursed one-third ($2,833.34) to Iberia Chiropractic Clinic to pay a portion of Matthew's medical bills, and issued a check for the remaining one-third ($2,833.33) to Ms. Racheau on Matthew's behalf. In September 2001, the trial court approved the settlement of Matthew's personal injury claim.
Ms. Racheau received Matthew's $2,833.33 check from respondent, but she refused to negotiate it because all of Matthew's medical bills had not been paid, as respondent had promised. In December 2001, Ms. Racheau discharged respondent and retained new counsel. Respondent refused to turn over Matthew's file, despite counsel's repeated requests, and failed to provide an accounting to Ms. Racheau. In January 2002, Ms. Racheau filed a complaint against respondent with the ODC. Thereafter, Ms. Racheau finally received Matthew's file.
In February 2002, two months after he was discharged, respondent stopped payment on Matthew's $2,833.33 check. He then filed a pleading in the trial court, purportedly on behalf of Ms. Racheau, to which he attached a "Settlement Disbursal Statement" that he represented had been inadvertently omitted from the filing in September 2001. However, unbeknownst to the court, respondent had revised the previously prepared disbursement statement to reflect that he retained one-third of Matthew's settlement ($2,833.34) as his attorney's fee, disbursed $4,984.45 to pay Matthew's medical bills (including $3,730 to Iberia Chiropractic Clinic, which had previously agreed to discount its bill to $2,833.33), and issued a check for the remaining $682.21 to Ms. Racheau on Matthew's behalf. Respondent did not discuss this matter with Ms. Racheau beforehand.
By letter dated January 6, 2003, the ODC asked respondent for a response to Ms. Racheau's allegation that she did not endorse Matthew's settlement check. On January 8, 2003, respondent stated:
I do not know whether Ms. Racheau signed the $8,500 check. However, since the court approved the settlement based on the pleading of Ms. Racheau, the signing of the Settlement Agreement by Ms. Racheau, and the signing of the Distribution Agreement by Ms. Racheau, it would seem that if she did not endorse the "back" of the settlement check, such would be unnecessary.
In its formal charges, the ODC alleged that respondent's conduct violated Rules 1.2(a), 1.4, 1.5(b), 1.5(c), 1.15(a) (safekeeping property of clients or third persons), 1.16(d) (obligations upon termination of the representation), 8.4(a), and 8.4(c) of the Rules of Professional Conduct. Respondent answered the formal charges and denied any misconduct.
At the hearing on the formal charges, Brandon Racheau testified that he treated with a chiropractor, Dr. Adel Malahmeh of the Iberia Chiropractic Clinic, for the injuries he sustained in the automobile accident. At his first appointment, Dr. *930 Malahmeh told Brandon that he "knew a good guy" and could call him if Brandon wanted to hire an attorney. Brandon agreed and respondent came to Dr. Malahmeh's office five or ten minutes later, at which time Brandon discussed his case with respondent and signed a contingent fee agreement. Brandon also told respondent that his younger brother, Matthew, was in the car with him when the accident occurred. Respondent expressed an interest in representing Matthew as well, and asked Brandon whether he could sign the contingent fee agreement for Matthew. Brandon testified that he replied, "he isn't of age, should I get my parents or something to sign for him, and [respondent] was like, Oh no, don't worry about it."
Tammy Racheau testified that she learned several days after the fact that respondent had been retained to represent Brandon and Matthew. Ms. Racheau had not given permission for respondent to represent Matthew, and he never showed her a copy of the contingent fee agreement, but she said that "since he was already there, I figured it was okay." After he was retained, Ms. Racheau met with respondent once to discuss Matthew's medical expenses, and a second time to sign the tutorship papers. At all times respondent assured Ms. Racheau that he would take care of Matthew's medical bills out of any settlement that Matthew received.
Ms. Racheau testified that respondent did not contact her about the settlement offer from the insurance company, nor did he seek her approval of the settlement amount before accepting the offer. Ms. Racheau did see a copy of the settlement check when she went to respondent's office to sign the tutorship papers, but she never endorsed the check or gave anyone permission to endorse it on her behalf. The settlement check was cashed nevertheless, and respondent sent Ms. Racheau a $2,833.33 check for Matthew's share of the settlement. Ms. Racheau told respondent that she would not cash the check until all of Matthew's medical bills were paid.
For the next several months, Ms. Racheau continued to receive notices from Matthew's medical providers that the bills had not been paid. Ms. Racheau tried to contact respondent to discuss the matter, but he did not return her calls. After she filed the disciplinary complaint, respondent stopped payment on the $2,833.33 check he sent to Ms. Racheau, paid all of Matthew's outstanding medical bills, and sent Ms. Racheau a check for $682.21, representing the remainder of Matthew's $8,500 settlement. Ms. Racheau testified that she never received the $682.21 check, as it was apparently sent to Dr. Malahmeh in error. Ms. Racheau eventually retained New Iberia attorney Edward Landry to address the problems she was having with respondent.
Mr. Landry testified that after Ms. Racheau retained him in December 2001, he sent respondent a letter advising of his representation and requesting a copy of Matthew's file. Respondent did not reply to the correspondence, apparently because it was not signed personally by Ms. Racheau. In February 2002, at which time respondent had no authority to represent Ms. Racheau's interests, he submitted a revised settlement disbursement statement to the court in connection with the settlement of Matthew's personal injury claim. In March 2002, respondent sent a letter directly to Ms. Racheau in which he advised that he had been "unsuccessful" in negotiating any discounts of Matthew's medical bills and that he had "revised" the disbursement statement and paid the invoices directly.
In his testimony, respondent admitted that he did not sign a contingent fee contract with Ms. Racheau. At one point *931 respondent claimed that he "relied on the Court's approval for that authority" because Matthew was a minor, while at another point he testified that Brandon Racheau "appeared to have the apparent authority to sign for his brother." Concerning the settlement check, respondent testified that he did not recall endorsing Ms. Racheau's signature, but conceded the endorsement "looks like it could be my handwriting."

Count VThe Myrick Matter
In December 2001, Quintina Mary Myrick and her boyfriend were involved in a motorcycle accident. Both sustained injuries in the accident, and Ms. Myrick, who is legally blind, had to undergo surgery. In February 2002, Ms. Myrick met with respondent to discuss her legal rights pertaining to the accident. Ms. Myrick's neighbor, Barbara Roberts, accompanied her to respondent's office for the consultation. After a brief discussion of perhaps ten minutes, during which Ms. Myrick emphasized that she had not yet decided whether to retain the services of a lawyer, Ms. Myrick and Ms. Roberts signed what they believed to be a registration form and left respondent's office. Ms. Myrick had no further contact with respondent after the meeting, and with the assistance of her boyfriend, she began making efforts to settle her personal injury claim with State Farm Insurance Company.
On October 23, 2002, respondent sent a letter to State Farm's adjuster offering to settle Ms. Myrick's claim for $15,942, of which $3,942 represented medical expenses and $12,000 represented damages for pain and suffering. Ms. Myrick learned of this settlement offer from State Farm's adjuster in November 2002. When Ms. Myrick confronted respondent, he presented her with a copy of the document that she and Ms. Roberts had signed at the meeting in February. The document was not a registration form, as Ms. Myrick had been led to believe, but was in fact a contingent fee contract. The contract had been notarized by respondent's son, Spencer Calahan, who was not present in the office on the day Ms. Myrick consulted with respondent.[12]
Ms. Myrick denied that she ever retained respondent or that she had knowingly signed a contract for legal services, but she discharged him from performing any additional work on her behalf by letter dated November 13, 2002. On November 25, 2002, Ms. Myrick negotiated a settlement of her claim with State Farm for $24,000 in damages and more than $22,000 in medical expenses, which State Farm paid directly to the providers. State Farm included respondent as a payee on the $24,000 settlement check, which was delivered to Ms. Myrick. However, Ms. Myrick refused to negotiate the check until respondent explained what fee he intended to charge. On December 23, 2002, State Farm reissued Ms. Myrick's settlement check at respondent's request and stopped payment on the first check. The replacement check was delivered to respondent. Respondent endorsed the $24,000 replacement check with both his signature and that of Ms. Myrick and deposited it into his client trust account.
*932 In February 2003, Ms. Myrick filed a complaint against respondent with the ODC. In May 2003, respondent provoked a concursus proceeding and deposited the sum of $24,000 into the registry of the court. P. Charles Calahan v. Quintina Mary Myrick, No.2003-2313 on the docket of the 15th Judicial District Court for the Parish of Lafayette. In his petition, respondent alleged that he was entitled to 37½% of the $24,000 settlement with State Farm pursuant to his contingency fee contract with Ms. Myrick.[13] Following a trial in May 2004, the trial court found that the contingency fee contract was not enforceable. The court dismissed the concursus and ordered that all of the settlement proceeds be turned over to Ms. Myrick. The court also awarded Ms. Myrick $5,000 in damages and $5,000 in attorney's fees for respondent's conduct in connection with the matter, which the trial judge characterized as "nothing short of fraud."
In its formal charges, the ODC alleged that respondent's conduct violated Rules 8.4(a), 8.4(c), and 8.4(d) of the Rules of Professional Conduct. Respondent answered the formal charges and denied any misconduct.
At the hearing on the formal charges, Ms. Myrick testified that she treated with Dr. Adel Malahmeh for the injuries she sustained in the motorcycle accident. After Dr. Malahmeh recommended respondent to Ms. Myrick "many times," she and her neighbor, Ms. Roberts, met respondent at his office on a Saturday morning in February 2002 for a consultation. No one else was present at the office during the meeting. Ms. Myrick said that she definitely did not hire respondent at this meeting, and told him that she would call him in the event she decided to do so. Respondent gave Ms. Myrick a paper to sign and assured her it was not a contract, but "it's just to let me know that you came by." Not able to read the paper, but thinking it was only a "sign-in" sheet, Ms. Myrick signed the document. Ms. Myrick had no further contact with respondent until November, when she found out that he had sent a letter to State Farm's adjuster asking to settle her claim. Ms. Myrick then sent respondent a letter telling him that he was not to perform any other work for her, in the event he thought that she had hired him. Respondent later received a settlement check for Ms. Myrick, which she refused to negotiate because "first of all, he wasn't representing me; and second, he didn't explain nothing. He didn't explain his fees, didn't write nothing down for us. It was just wrong."
Barbara Roberts testified that she brought Ms. Myrick to respondent's office for a consultation. No one else was present at the office during the meeting. Ms. Roberts could not recall any conversation between Ms. Myrick and respondent about a form to be signed by Ms. Myrick, but Ms. Roberts recalled that she signed a document as a witness. Ms. Roberts did not know what she was signing and did not read the form before she signed it. Ms. Roberts testified that she heard Ms. Myrick tell respondent that she was not hiring him and that he was not to take any action on her behalf unless she contacted him.
Attorney Edward Landry agreed to represent Ms. Myrick in the concursus proceeding. Mr. Landry filed responsive pleadings on Ms. Myrick's behalf and reconvened against respondent for misrepresentation and fraud. At trial, the contingent fee agreement signed by Ms. Myrick *933 and witnessed by Ms. Roberts was introduced into evidence. The agreement was also signed by Spencer Calahan, respondent's son, as notary. It was not disputed that Spencer Calahan was not present when the contract was signed, but respondent claimed that the only reason Spencer Calahan signed the contract was to authenticate respondent's signature so that the contract could be recorded in the public records. Respondent also claimed that his son had executed an affidavit to that effect which was filed into the public records along with the contingent fee contract. After hearing this testimony, Mr. Landry went to the courthouse in New Iberia and examined the public records. Mr. Landry found no affidavit attached to the recorded contingent fee contract. Mr. Landry also discovered that the recorded contingent fee contract bears the signature of two witnesses, while the contract respondent provided to Ms. Myrick bears the signature of only one witness, Ms. Roberts.[14] The trial court ultimately ordered that all the money in the concursus proceeding with interest be immediately turned over to Ms. Myrick, and ruled in Ms. Myrick's favor on the fraud allegation, awarding $5,000 in damages and $5,000 in attorney's fees, plus costs.
In his testimony, respondent stated that Ms. Myrick did, in fact, retain him to represent her in connection with her personal injury claim and that she fully understood the contingent fee contract. Respondent testified that he sent the settlement demand to State Farm because the prescription date was approaching and he could not reach Ms. Myrick to talk with her about the claim. He admitted that he did not discuss the settlement demand with Ms. Myrick before he made it, and that the demand grossly understated Ms. Myrick's medical expenses. Respondent also claimed that after the settlement check was issued, Ms. Myrick told him that her boyfriend had stolen the check and asked that the check be reissued.[15] Respondent complied with these instructions, but Ms. Myrick's boyfriend would not let her endorse the replacement check, so respondent deposited the check into his client trust account pursuant to "the contract that I believed to be valid." Respondent testified that he subsequently tried to discuss the matter with Ms. Myrick and "to tell her I wasn't interested in a fee," but she refused to return the calls, so respondent deposited the check into the registry of the court.

Hearing Committee Recommendation
In Count I, the Judiciary Commission matter, the hearing committee found that respondent openly and publicly revealed the existence of a confidential Judiciary Commission complaint. Respondent referred to the confidential complaint as a basis for recusing the trial judge even though he had separate and independent grounds for arguing for recusal, i.e., the judge had recused himself in another matter. Regardless of whether recusal was justified, respondent failed to protect the confidentiality of the complaint he filed, and used the fact of such filing to justify an argument to remove the judge. The committee found there is no evidence that respondent tried to protect the confidentiality of the complaint, such as arguing the motion to recuse in an in-chambers conference or requesting that his motion *934 be sealed. By referencing the complaint in the open manner and under the circumstances in which he did, the committee determined that respondent knowingly violated the rules of the Judiciary Commission and Rule 8.4(d) of the Rules of Professional Conduct.
In Count III, the Temple matter, the committee found that respondent advanced the sex charges against Sergeant Temple mindful of their falsity and with reckless disregard for the truth. By using his power as an attorney to urge an issue before the court without a good faith basis to do so, respondent violated Rules 3.1 and 3.3(a)(1). In a similar vein, his actions violated Rule 8.4(c) because the defamatory statements were made with actual malice, an exceptionally high standard that encompasses "dishonesty," "deceit," and "misrepresentation," all components of Rule 8.4(c). Finally, respondent's actions were a dishonorable abuse of the office of attorney. His defamatory statements about Sergeant Temple, together with the media attention caused by his actions, and the litigation against the trial judge personally, all evidence conduct that is prejudicial to the administration of justice. Respondent's actions caused harm to a police officer, tarnished the office of attorney in the eyes of the public, and wasted judicial resources and that of parties litigant. Based on these findings, the committee determined that respondent violated Rules 3.1, 3.3, 8.4(a), 8.4(c), and 8.4(d).
In Count IV, the Racheau matter, the committee found that respondent settled his clients' claims without their authorization or participation. He failed to keep his clients informed about the status of their cases, including the settlement negotiations and the handling of the settlement funds, and he did not communicate with Tammy Racheau before amending the settlement disbursement he filed in the tutorship proceeding. Furthermore, with respect to his representation of Matthew Racheau, a minor, respondent did not sign a written contingent fee agreement with Ms. Racheau, who was Matthew's natural tutrix. The committee found respondent's defense that Brandon Racheau, Matthew's older brother and a major, had "apparent authority" to sign for Matthew was not credible. Respondent also endorsed Ms. Racheau's signature on Matthew's settlement check without her knowledge, permission, or authorization. After he was discharged, respondent refused to turn over the Racheau file to their new counsel, Mr. Landry. Based on these findings, the committee determined that respondent violated Rules 1.2, 1.4, 1.5, 1.16, 8.4(a), and 8.4(c). The committee found no violation of Rule 1.15, given that respondent deposited Matthew's settlement check into his client trust account and provided accountings of the distribution of the funds.
Finally, in Count V, the Myrick matter, the committee found that respondent did not abide by Ms. Myrick's wishes and pursued the settlement of her personal injury claim without her authorization. He also failed to communicate with her before making a settlement demand to State Farm. Respondent did not explain the contingent fee agreement to Ms. Myrick, a legally blind client, and in fact told her that she was signing registration paperwork; he then had the contract notarized and witnessed after the fact. Respondent also signed Ms. Myrick's name to the settlement check that she refused to endorse. Based on these findings, the committee found that respondent violated Rules 1.2, 1.4, 1.5, 8.4(a), and 8.4(c).
The committee determined that the baseline sanction for respondent's misconduct is suspension. The violations were knowing and caused injury or potential injury to the clients or others. The committee found the following aggravating factors *935 are present: prior disciplinary offenses, a dishonest or selfish motive, a pattern of misconduct, multiple offenses, vulnerability of the victims, and substantial experience in the practice of law. The committee recognized no mitigating factors.
Based on these findings, the committee recommended that respondent be suspended from the practice of law for three years, with all but one year and one day deferred.
Both respondent and the ODC filed objections to the hearing committee's report and recommendation in 04-DB-029. The ODC argued that the sanction recommended by the committee is too lenient, while respondent asserted that the sanction recommended by the committee is too harsh.

Disciplinary Board Recommendation 02-DB-032 & 04-DB-029
The disciplinary board found that the hearing committees' factual findings are not manifestly erroneous. The board also determined that the committees correctly applied the Rules of Professional Conduct, with the exception of Count I of 02-DB-032, the Hebert matter, in which the board declined to find that respondent violated Rule 8.3(a) by failing to report the misconduct of another lawyer.[16] In all other respects, the board found that respondent violated the Rules of Professional Conduct as found by the committees.
The board concluded that respondent knowingly and intentionally violated duties owed to his clients, to the public, and to the legal system. Mr. Hebert was harmed by having to retain legal counsel and sue respondent to get his money. Ms. Payton was placed in a very difficult and potentially dangerous situation by the false affidavit alleging spousal abuse. Respondent's unauthorized execution and notarization of an affidavit on behalf of Ms. Payton,[17] which he in turn filed with the court, harmed Ms. Payton's husband and the legal system and resulted in the issuance of an inappropriate temporary restraining order. Ms. Racheau was deprived of the right to participate in the settlement of her minor son's personal injury claim and her efforts to have Matthew's file sent to another attorney were ignored. Ms. Myrick was forced to engage legal counsel to represent her in a concursus proceeding as a result of respondent's unauthorized retention of her personal injury settlement. A judicial complaint against a sitting judge, a confidential matter, was made public by respondent during a recusal hearing. A police officer, Sergeant Temple, was awarded $10,000 in a defamation suit against respondent for accusing her of having a sexual relationship with a convicted felon. Under the ABA's Standards for Imposing Lawyer Sanctions, the baseline sanction for respondent's misconduct ranges from suspension to disbarment.
As aggravating factors, the board recognized respondent's prior disciplinary offenses, a dishonest or selfish motive, a pattern of misconduct, multiple offenses, vulnerability of the victims, and substantial experience in the practice of law. In mitigation, the board recognized the imposition of other penalties or sanctions (the $10,000 judgment against respondent in the defamation case). The board also found that respondent's 1996 admonition is remote in time.
*936 Relying on In re: Bilbe, 02-1740 (La.2/7/03), 841 So.2d 729,[18] which the board suggested involved misconduct similar to that at issue here, and noting that the mitigating factors do not outweigh the aggravating factors present, the board recommended that respondent be disbarred.
Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b). Despite notice, respondent did not appear for argument.[19]

DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
Respondent has clearly engaged in professional misconduct. In Count I of 02-DB-032, the Hebert matter, respondent charged his client a $12,500 legal fee to write a one-page demand letter to another lawyer who, ironically, had charged the client an excessive legal fee. Mr. Hebert had specifically refused to pay respondent's proposed 40%-50% contingent fee in connection with the endeavor, but nevertheless, the legal fee respondent charged was approximately 40% of the amount recovered from the first lawyer. When Mr. Hebert questioned the amount of the fee, respondent refused to acknowledge his client's justifiable concerns, telling him in a rather cavalier fashion to "do what you got to do."
Mr. Hebert took respondent's advice and filed a disciplinary complaint and a civil suit against respondent. In the disciplinary matter, respondent began with the argument that the fee was negotiated and was not a contingent fee. Meanwhile, in the civil suit, respondent argued that he did have a contingent fee agreement. When it became apparent that argument was going to be unsuccessful because the contingent fee agreement was not in writing, respondent said the fee was calculated on an hourly basis. In support of that argument, respondent conjured up a timesheet showing that he worked on Mr. Hebert's case for 81 hours, which coincidentally was enough time to justify the entirety of the $12,500 fee. The trial court correctly rejected this fabrication, but respondent persisted *937 in that argument during his disciplinary hearing. He continues to maintain that he is entitled to the exorbitant fee because it was fully earned (reasoning that the successful oil well has to pay for the "dry holes"), and indeed questions why his client objected in the first place, since the $17,500 Mr. Hebert received was more than what he started out with. We find respondent's conduct in this case is serious, and his defense of the matter has bordered on perjury. Standing alone, the misconduct in Count I warrants a lengthy suspension from the practice of law. See, e.g., In re: Levingston, 00-0161 (La.2/25/00), 755 So.2d 874.
Just as egregious as the excessive fee is respondent's misconduct in Count II of 02-DB-032, the Payton matter. Respondent filed a petition for divorce on Ms. Payton's behalf without allowing her to review it beforehand. He included in the petition untruthful allegations of harassment and abuse, both sexual and physical, even after his client told him that she had not been harassed or abused by her husband. He also forged his client's signature on the affidavit verifying the truthfulness of the allegations in the petition. Based on the false allegations of harassment and abuse, the trial court issued a restraining order against Ms. Payton's husband. When Ms. Payton discovered what respondent had done, he told her that was "standard wording in a restraining order" and that he had no idea how her signature came to be forged on the affidavit. Then, when Ms. Payton filed a disciplinary complaint, respondent avoided altogether the issue of his misconduct and instead suggested that his client was "emotionally disturbed," "dependent," and "in serious need of professional counseling for her emotional stability." When specifically asked to respond to the forgery allegation, respondent first stated that the signature was "authorized" (the hearing committee found it was not). Only in response to a direct question by the ODC whether he signed his client's name on the affidavit did respondent reluctantly admit what he had done, justifying his actions as merely "a matter of convenience to the client and to the court system." Once again, standing alone, the misconduct in this count warrants a lengthy suspension from the practice of law.[20]
The misconduct in the second set of formal charges continues in the same pattern. In Count I of 04-DB-029, respondent blatantly violated the confidentiality rule applicable to complaints filed with the Judiciary Commission. In Count II, the Temple matter, a New Iberia newspaper reported allegations by respondent in a pre-trial memorandum that Sergeant Colleen Temple of the New Iberia Police Department had a "special relationship" with a convicted felon, which may have involved sexual intimacy. Several days later, respondent admitted that he had no proof the allegation was true. In a defamation suit subsequently filed by Sergeant Temple, the trial court found that respondent's statements were false and defamatory and made with actual malice, under the exceptionally high standard of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
Unlike a criminal conviction, this determination by the trial court is not binding on this court. In re: Bilbe, 02-1740 (La.2/7/03), 841 So.2d 729 (citing Supreme *938 Court Rule XIX, § 19 and In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343). Nonetheless, there is more than ample evidence in the voluminous record before us to support a finding, under the clear and convincing evidentiary standard, that respondent made knowingly false and malicious statements about Sergeant Temple. Respondent knew that he could not substantiate his accusation that Sergeant Temple was involved in a sexual relationship with Mr. Chargois, a convicted felon, yet he made the allegation anyway. The allegation was then repeated in two newspaper articles that were published shortly before the trial of the Davis case, further embarrassing Sergeant Temple.
In Count IV, the Racheau matter, the hearing committee made a factual finding that respondent asked his adult client, Brandon Racheau, to sign a contingent fee agreement on behalf of his fourteen-year old brother, Matthew, all the while brushing aside Brandon's concerns that his mother should sign the agreement on Matthew's behalf. Respondent then proceeded to negotiate a settlement of Matthew's personal injury claim without the involvement of Matthew's mother. He forged Ms. Racheau's endorsement on the settlement check (an act which he later claimed was inconsequential because Ms. Racheau had signed the tutorship papers) and deposited the check into his client trust account so that he could collect his attorney's fees. However, respondent failed to pay all of the medical expenses Matthew incurred in connection with the accident. When Ms. Racheau could not resolve this issue with respondent, she discharged him, retained new counsel, and filed a complaint with the ODC. After being served with the complaint, respondent stopped payment on Ms. Racheau's settlement check and filed a revised disbursement statement in the trial court, purportedly on her behalf, though he had no authority to do so. Respondent also refused to send Ms. Racheau's file to her new attorney.
Perhaps most troubling of all is respondent's conduct in Count V, the Myrick matter. Respondent defrauded a legally blind woman into signing a contingent fee agreement by assuring her that it was just a form "to let me know that you came by." He then sent a letter to the insurance company advising that he had been retained to represent Ms. Myrick, and offering to settle her claim for a fraction of what it was worth. Ms. Myrick learned of this contact from the adjuster, not from respondent, and when she confronted him, she learned for the first time that she had not signed a simple "registration form." She also learned that the contingent fee agreement bore the signature of a witness and a notary, neither of whom were present at the time she met with respondent.
Ms. Myrick immediately terminated respondent, but two weeks later, when she herself settled her claim with the insurance company, respondent was included as a payee on the settlement check. The insurance company hand delivered the settlement check to Ms. Myrick, but she refused to negotiate it until respondent explained what fee he intended to charge for his "representation." Undaunted, respondent told the adjuster that Ms. Myrick's boyfriend had stolen the settlement check from her and that she wanted to put a stop payment on it. He also told the adjuster to send the replacement check to him, not to Ms. Myrick. The adjuster did so, respondent endorsed the replacement check with both his signature and that of Ms. Myrick, and he deposited the check into his trust account. Five months later, after Ms. Myrick filed a disciplinary complaint, respondent provoked a concursus proceeding and deposited the entirety of Ms. Myrick's settlement into the registry *939 of the court so that he could collect a 37½% attorney's fee pursuant to his so-called contingent fee agreement. Fortunately, after a trial, respondent was ordered to repay the entirety of the settlement to Ms. Myrick. He was also ordered to pay an additional $10,000 in damages and attorney's fees for his conduct, which the trial court charitably described as "nothing short of fraud."
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In considering that issue, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass'n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
There is no doubt that petitioner acted knowingly and intentionally when he violated duties owed to his clients, the public, and the legal system. His conduct caused actual harm in every case subject of the formal charges. The baseline sanction for this misconduct is disbarment.
Respondent's misconduct must be further considered in light of the significant aggravating factors present, in particular the demonstrable pattern of misconduct, respondent's utter lack of remorse and refusal to acknowledge the wrongful nature of his conduct, his false statements during the disciplinary process, and the vulnerability of the victims. In comparison, the sole mitigating factor supported by the recordthe imposition of other penalties or sanctionsis inconsequential.
In the face of respondent's egregious misconduct, the harm he has visited upon his clients, and the numerous aggravating factors present, the only appropriate sanction in this case is disbarment.

DECREE
Upon review of the findings and recommendations of the hearing committees and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Pressley Charles Calahan, Louisiana Bar Roll number 20057, be and he hereby is disbarred. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
NOTES
[1] The hearing committee and disciplinary board found that respondent did not violate the Rules of Professional Conduct as charged in Count II of 04-DB-029, the Broussard matter. The ODC does not object to that finding; accordingly, no reference is made in this opinion to that count.
[2] The "reconstructed" time sheet was prepared by respondent shortly before the May 2002 trial. It contains entries for legal research (24 hours), travel (28 hours), review of court records (10 hours), and conversations with Mr. Hebert (10 hours), as well as 2 hours for going to the bank to deposit the settlement check and preparing a settlement statement. The remaining 7 hours include time for drafting the demand letter (2 hours), settlement discussions with opposing counsel (2 hours) and Mr. Hebert (1 hour), and reviewing the settlement documents and discussing them with Mr. Hebert (2 hours). All of the entries are undated, but respondent claimed that he started "actually doing work on this case" in July 2000. Mr. Hebert did not retain respondent until late September of that year.
[3] In March 2003, the district court's judgment in the civil case was affirmed on appeal. Hebert v. Calahan, 02-1237 (La.App. 3rd Cir.3/5/03), 839 So.2d 1156. The court of appeal noted in its opinion that respondent's $12,500 fee was "grossly out of proportion with the fees normally associated with writing a demand letter." Respondent represents that following the court of appeal's ruling, he paid the judgment against him in full.
[4] Respondent explained the "oil well" reference in his March 2001 sworn statement:

The risk, the riskI don't think you understand what risk really means here. Risk is the probability of success, okay? It doesn't matter really how much money I have got laid out to get a certain amount of recovery although it is a consideration. And when we drill an oil and gas well, we look at the probability of success and one out of nine is successful. The one that is successful has to pay the expenses of the ones that are not successful. This is why we have a contingency fee agreement that tends to be much in excess of what our actual expenses are. Do you understand what I am saying? [emphasis added]
[5] The petition stated in relevant part as follows:

15.
Defendant has harassed and physically abused Plaintiff and threatens to continue to do so, and Plaintiff fears that Defendant will harass, sexually abuse or physically abuse Plaintiff during the pendency of these proceedings.
16.
A temporary restraining order should issue herein, without bond, directed to Defendant, restraining and enjoining Defendant from harassing or sexually or physically abusing Plaintiff.
[6] The committee rejected respondent's defense that the language was "boilerplate," given his specific conversations with Ms. Payton about the matter.
[7] Respondent was admonished by the disciplinary board in 1996 for his violation of Rules 1.15(b), 1.15(c), 8.4(a), and 8.4(c) of the Rules of Professional Conduct stemming from his failure to pay a third-party medical provider (see 96-ADB-030).
[8] The Office of Special Counsel did not accept respondent's complaint for investigation, pursuant to the rules of the Judiciary Commission which permit the screening out of complaints which are "deemed obviously unfounded or frivolous, or which solely criticize a judge's official decision making or claim judicial error." The screen out decision was subsequently confirmed and ratified by the Commission, and respondent was so notified in August 2002.
[9] In March 2003, the district court's judgment in the defamation case was affirmed on appeal. Temple v. Calahan, 02-0983 (La.App. 3rd Cir.3/5/03), 841 So.2d 103 (designated not for publication). Respondent represents that following the court of appeal's ruling, he paid the judgment against him in full.
[10] As previously indicated, the complaint was screened out by the Office of Special Counsel. See note 8, supra.
[11] The ODC asked a forensic document examiner to study the check and various samples of the signatures of both Ms. Racheau and respondent in an effort to determine whether Ms. Racheau endorsed the settlement check. The expert determined that it is strongly probable that the signature of Tammy Racheau appearing on the back of the check was not signed by Ms. Racheau herself.
[12] Respondent would later explain that Spencer "only signed that for identification with his affidavit where I swore that it was my signature on there. That in the Code is called a signature under private act that's been acknowledged after the fact." Respondent suggested that Spencer signed the contingent fee agreement so that it could be recorded in the public records; respondent denied that it was his intent to make it appear as though the document had been signed in Spencer's presence. Interestingly, at the hearing on the formal charges, respondent testified that he signed Spencer's name as notary on the contingent fee agreement, with Spencer's permission.
[13] Even accepting respondent's allegation as true, his "contingency fee" could not have exceeded $9,000. When asked why he did not turn over the remainder of the settlement funds to Ms. Myrick before provoking the concursus proceeding, respondent testified, "I didn't know if there was anybody else out there that had a claim to any of that money."
[14] In response to the questions of a hearing committee member, respondent denied any knowledge of how the second witness signature came to appear on the recorded contingent fee agreement.
[15] Both Ms. Myrick and her boyfriend denied that any such thing occurred.
[16] The board noted that as a matter of strategy, respondent's demand letter accused the lawyer of charging an excessive fee, but found this does not amount to a finding that respondent had unprivileged knowledge of an alleged violation by another attorney.
[17] The board erroneously stated in its recommendation that respondent signed Ms. Payton's name to the affidavit and then had another attorney notarize it. In fact, it is absolutely clear that respondent himself signed and notarized the document.
[18] In Bilbe, the respondent knowingly made numerous false statements to an immigration judge, engaged in disruptive behavior before the judge by arguing with him and telling him not to speak to her client, communicated with an opposing party represented by counsel, and failed to cooperate with the ODC in its investigation. This court imposed a three-year suspension, rather than disbarment, largely because the mitigating factors outweighed the aggravating factors present.
[19] In February 2006, the clerk's office issued notice that the court would hear oral argument on respondent's objection on the morning of April 5, 2006. By letter dated March 30, 2006, but not received by the court until the afternoon of April 4, 2006, respondent notified the clerk that "due to a scheduled surgery, I will be unable to attend oral arguments in the captioned matter." Because respondent's correspondence did not request a continuance, oral argument proceeded as scheduled.
[20] See Stephens and Boutall cited by the hearing committee and the disciplinary board, in which the lawyers were suspended for eighteen months for misconduct similar to respondent's herein. While both Stephens and Boutall had prior discipline in the form of suspensions from the practice of law, that fact was not necessarily determinative in our consideration of an appropriate sanction.