PER CURIAM
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, John Morris Dunn, III, an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS AND PROCEDURAL HISTORY
By way of background, respondent represented numerous personal injury clients *985 whom he referred to Dr. Stewart Altman for medical treatment or who sought treatment from Dr. Altman on their own. For some of these clients, respondent signed letters of guarantee to Dr. Altman.
At some point, Dr. Altman sold his medical practice to MCNO, LLC d/b/a SouthShore Physician Group (hereinafter referred to as "SouthShore"). On February 23, 2011, SouthShore sent respondent a letter with a list of his clients' outstanding accounts totaling $74,058.50. In the letter, SouthShore stated:
We have tried many times to communicate with you regarding these cases that you guaranteed payment on after settled [sic] and you have not returned our calls. There for [sic] you left us no choice but to contact the patients to find out about there [sic] cases and we were notified by the patients that the cases settled and money was held for there [sic] medical expenses that they accrued with SouthShore Physician Group.
If you do not make payment arrangements with our office as soon as possible ... you leave us no alternative but to file the patient correspondents [sic], your letter of guarantees and all outstanding accounts with the Louisiana Attorney Disciplinary Counsel and we will also hire legal counsel and bring you to court regarding these outstanding accounts. Several of your clients are willing to testify in this matter.
In response to this letter, respondent wrote to SouthShore to explain that he had been having heart problems and financial problems since November 2004. However, he failed to make payment arrangements or otherwise address the issue with SouthShore.
As a result, SouthShore referred the outstanding patient accounts to its attorney, Mr. Aubrey Hirsch. SouthShore also filed a disciplinary complaint against respondent on June 2, 2011. On July 19, 2011, respondent informed the ODC that he had met with Mr. Hirsch about the accounts and had explained to Mr. Hirsch that many of the patients on SouthShore's list had treated with Dr. Altman before retaining respondent, some patients had treated with Dr. Altman but never retained respondent, and some patients' cases were unsuccessful. At their meeting, respondent and Mr. Hirsch on SouthShore's behalf entered into a compromise agreement.
In a July 13, 2011 letter to respondent, SouthShore set forth the terms of the compromise agreement, indicating that it had accepted a total of $38,050 to settle all of the outstanding client accounts associated with respondent. The letter also indicated that respondent had made an initial $17,050 payment to SouthShore, leaving a $21,000 balance to be paid through monthly payments of $125 "unless Mr. Dunn is able to come up with more funds or we [SouthShore] are aware of more funds available." On August 8, 2011, SouthShore confirmed the compromise agreement to the ODC but informed the ODC that respondent had not yet signed the July 13, 2011 letter to memorialize his acceptance of the compromise agreement. Although respondent made all of the monthly payments to SouthShore, he did not sign the July 13, 2011 letter until February 4, 2013.
SouthShore's disciplinary complaint sat dormant with the ODC until February 15, 2016, when the ODC filed formal charges against respondent. The formal charges read as follows:
On or around June 2, 2011, the Office [of] Disciplinary Counsel (ODC) received a complaint from third party medical provider Southshore Physician Group. The complaint provides that the Respondent owed approximately $74,000.00 to them for medical services provided to his clients in various personal injury *986 matters. The Respondent failed to communicate with the Complainant regarding the status of payment regarding the same. As a result, the Complainant was compelled to contact the clients directly. Upon contacting the clients, the Complainant was informed that the personal injury matters had settled and funds owed to the third party medical provider were deducted from the final settlement. The Respondent failed to pay the third party medical provider.
Respondent informed the Complainant that without prior notice, his health failed and he underwent an emergency quadruple bypass heart surgery. At the time, Respondent had no medical insurance and was billed approximately $150,000.00. As a result, Respondent was unable to work for a period of time. Respondent utilized the third party funds designated to the Complainant for medical services rendered to his personal injury clients to pay his personal medical bills and to sustain himself during the time he was unable to work.
Subsequent to the filing of the complaint, Respondent entered into a payment arrangement with the third party medical provider and is making payments on the balance owed.
Respondent's actions in this matter constitute violating or attempting to violate the Rules of Professional Conduct, in violation of Rule 1.15(a) (failed to hold property belonging to a third person, that is in lawyer's possession, in connection with a representation, separate from the lawyer's own property); Rule 1.15(c) (withdrew funds held in lawyer's client trust account that were not earned fees, belonging to a third party); Rule 1.15(d) (upon receiving funds belonging to a third person, lawyer failed to promptly notify the third person); Rule 8.4(a) (violated the Rules of Professional Conduct); and Rule 8.4(c) (engaged in conduct involving dishonest, fraud, deceit or misrepresentation).
Respondent answered the formal charges, denying any misconduct, and the matter proceeded to a formal hearing on the merits scheduled for December 9, 2016. Prior to the hearing, the ODC's forensic auditor conducted an audit of respondent's client trust account for the period beginning January 1, 2007 and ending February 28, 2013 and reported her findings to the ODC in an audit report dated November 14, 2016.
The audit report revealed numerous unidentifiable transactions, including the following: multiple disbursements to respondent without reference to a specific client, earned fee, or associated deposit; multiple disbursements to various payees that may be clients or third parties but without associated deposits; multiple disbursements that may be for respondent's personal expenses (including a $240,000 disbursement to Wetlands Aquarium on January 11, 2012); multiple disbursements via checks made payable to cash and endorsed by respondent; and multiple deposits without reference to a specific client (including a $280,548.24 wire transfer deposit on August 18, 2011). The disbursements to respondent not associated with a specific client, fee, or deposit totaled more than $498,000. Cash withdrawals or wire transfers withdrawals without reference to a specific payee totaled almost $165,000. After completing the audit of respondent's client trust account, the ODC's forensic auditor concluded that:
As stated and illustrated above Mr. Dunn has misused and converted the funds in his client trust as well as having accounting errors and potential commingling at times. His account balance falls below the amount necessary to honor funds deposited on multiple occasions and disbursements are often made prior *987 to the associated deposit. Due to the lack of information a necessary balance at the end of the audit period to honor all client and third party obligations cannot be determined at this time. He fails to provide sufficient support to confirm he properly documents his records to ensure he is handling his IOLTA trust account properly.
Hearing Committee Report
After considering the testimony and evidence presented at the hearing, the hearing committee made several factual findings. Those findings consisted of the following:
Respondent testified that he had a longstanding personal and professional relationship with Dr. Altman, and he referred clients from his personal injury practice to Dr. Altman for treatment. The ODC introduced several letters from respondent to Dr. Altman, dated between 1997 and 2000, wherein respondent guaranteed payment of any medical costs of certain clients upon settlement of the clients' claims.
In September 2009, Ms. Schultz began sending letters on SouthShore's behalf to respondent regarding various clients and requesting status updates on the clients' cases as payment was outstanding. Respondent appeared to have simply ignored the letters until Ms. Schultz threatened to report him to the ODC. Respondent finally wrote a letter to Ms. Schultz recounting several alleged hardships he had endured, including a 2004 heart attack, $150,000 in medical bills, damage to his office by Hurricane Katrina, heart surgery in 2008, a line of credit closed by Chase Bank, and another heart surgery soon thereafter; respondent did not offer any good faith attempt to settle the outstanding accounts, give the status of any of the outstanding matters, or offer any explanation as to why he made no attempt for years to contact SouthShore about the status of the matters. However, he did state that he attempted to contact Ms. Schultz on Facebook to "meet for coffee so I could tell you all the bad things that have happened to me and see who I should talk to." Ms. Schultz responded that she was sorry about his recent problems but that she still expected payment. During her testimony, Ms. Schultz indicated that she had to contact respondent's clients to force him to communicate with her because he was uncommunicative for long periods of time.
The ODC's forensic auditor testified that respondent's misuse of his client trust account included cash withdrawals, failures to endorse deposited checks, and the payment of personal expenses. Payments to Best Buy, Walgreens, and Wetlands Aquarium appeared to be for personal expenses, and respondent was unable to counter this assumption. The records of respondent's trust account show some legitimate payments to clients, but many of the payments respondent made to himself failed to note on the check the reason for the disbursement. The ODC's forensic auditor also testified that settlement checks were received for some of respondent's clients without subsequent disbursements to SouthShore. In other cases, SouthShore was paid but only years after respondent received settlement funds. Furthermore, the trust account had a negative balance due to a check printing charge at a time when SouthShore was due funds in cases that had settled.
In his defense, respondent stressed that his personal relationship with Dr. Altman resulted in a rather loose "laissez-faire" arrangement where he could stop by Dr. Altman's office and have clients' fees reduced or waived altogether in the preceding years. He further testified that he made some efforts to contact Dr. Altman but could not reach him. Likewise, he testified that he attempted to reach Ms. *988 Schultz at some point, but she was unavailable and did not return his calls.
Despite the fact that he was receiving written communication from Ms. Schultz on a regular basis and she handled Dr. Altman's accounts and then SouthShore's accounts, respondent testified that he was confused about whether this successor entity was the appropriate party to collect fees since he felt his loyalty was to Dr. Altman. Respondent also testified that he suffered serious health problems, which caused him to not be on top of matters as much as he once was.
On July 13, 2011, realizing SouthShore was serious about pursuing the matter with the ODC after hiring an attorney to collect, respondent worked out a compromise agreement with SouthShore wherein he agreed to pay $125 per month in restitution toward a balance of $38,050. The parties apparently came to this final number because many of the claims had prescribed and respondent disputed whether certain funds were even due. Respondent made an initial lump sum payment of $17,050 and has subsequently been paying $125 per month. He currently owes SouthShore $13,000. The compromise agreement stated that the $125 per month payment was premised on good faith that respondent would make SouthShore aware if he had more funds available, and respondent signed the compromise agreement.
On January 11, 2012, respondent wrote a trust account check in the amount of $240,000 and made payable to Wetlands Aquarium Park, which respondent testified was a non-profit corporation. Respondent further testified that the $240,000 came from funds he received via a reverse mortgage on his house, and he used the $240,000 for a charitable endeavor that would educate children about exotic fish. He made no effort to inform SouthShore that he was in the process of obtaining this money or that he had access to this amount of money when the reverse mortgage closed. His defense that there was already a compromise agreement in place and he did not have any obligation to pay more than the $125 per month is not supported by the clear wording of the agreement.
Based on these findings, the committee determined that respondent violated Rules 1.15 (safekeeping property of clients or third persons), 8.4(a), and 8.4(c) of the Rules of Professional Conduct. The committee went on to find that respondent's excuses for his repeated failure over many years to proactively seek the proper party to pay for Dr. Altman's treatment of his clients were disingenuous and not credible in light of his considerable experience in the practice of personal injury law. Furthermore, the fact that money flowed in and out of respondent's trust account in the manner described by the ODC's forensic auditor goes well beyond sloppy recordkeeping and innocent mistakes. It appears respondent used his trust account as a "personal slush fund" for various purchases with little to no regard to safeguarding funds belonging to Dr. Altman and SouthShore. Especially egregious was that SouthShore appeared to have made many good faith efforts to work with respondent before reporting him to the ODC. Respondent betrayed the trust of the longstanding relationship he had with Ms. Schultz by keeping money that was not his, and reaching out to her on social media was not sufficient. Furthermore, the audit indicated that respondent's trust account balance fell well below the agreed-upon amount he owed SouthShore, indicating that conversion took place. Respondent also misrepresented to his clients that he would pay these medical bills, and he simply did not do so, which conceivably could have caused harm to their credit. Based on the evidence in the record, it appears the conversion applied to many clients who *989 treated with Dr. Altman over the course of several years. Furthermore, even after SouthShore worked out a monthly payment plan with respondent, he almost immediately secured $240,000 for a personal, albeit charitable, venture as opposed to making SouthShore whole.
The committee additionally found that Dr. Altman started to close his medical practice without having these outstanding invoices paid. The committee believed respondent knew this and assumed he did not have to pay these bills, so he treated this money as his own. His testimony that he had no idea what happened to Dr. Altman, with whom he had a longstanding personal and professional relationship, was not credible.
Noting that the delay in these disciplinary proceedings would be troubling to any respondent in that there is a reasonable expectation that a disciplinary complaint should be investigated and disposed of expediently, the committee nevertheless determined the delay does not change the fact that respondent violated the Rules of Professional Conduct. No evidence exists in the record that the ODC decided not to pursue formal charges in lieu of the compromise agreement between respondent and SouthShore. Furthermore, while the committee was sympathetic to respondent's ongoing medical problems and other hardships he has faced in recent years, it determined there was no rational excuse for the conversion of funds to this extent over this period of time.
The committee then determined that respondent knowingly and intentionally violated duties owed to a third-party medical provider and caused actual harm to SouthShore. After considering the ABA's Standards for Imposing Lawyer Sanctions , the committee determined the baseline sanction is disbarment. In aggravation, the committee noted respondent's substantial experience in the practice of law (admitted 1971). In mitigation, the committee noted the absence of a prior disciplinary record. Additionally in mitigation, the committee noted that respondent has been providing pro bono legal services to some indigent litigants and has been making monthly payments to SouthShore for the past several years.
After also considering this court's prior jurisprudence addressing similar misconduct, the committee recommended respondent be disbarred. The committee further recommended respondent be ordered to continue to make monthly payments to SouthShore.
Neither respondent nor the ODC objected to the hearing committee's report. However, in his brief to the disciplinary board, respondent suggested that he had been ignorant of the rules regarding trust accounts and urged that a deferred suspension be imposed, subject to probation.
Disciplinary Board Recommendation
After review, the disciplinary board found that the hearing committee's factual findings are not manifestly erroneous and are supported by the record. Based on these facts, the board determined that respondent violated the Rules of Professional Conduct as charged, with the exception of Rule 1.15(c), which the board determined is not applicable to the facts of this matter because it addresses deposits into the client trust account of legal fees and expenses that have been paid in advance, not settlement funds owed to third parties.
The board then determined that respondent knowingly and intentionally converted funds owed to a third party. His conduct caused actual harm to the third party and had the potential to harm his former clients if SouthShore sought to collect against the clients. After considering the ABA's Standards for Imposing Lawyer Sanctions , the board determined that the *990 baseline sanction is in the range of suspension to disbarment.
In aggravation, the board found a prior disciplinary record (a 2001 admonition for failing to protect funds owed to a third-party medical provider), a dishonest or selfish motive, a pattern of misconduct, and substantial experience in the practice of law. In mitigation, the board found personal or emotional problems, the delay in the disciplinary proceedings, and the remoteness of the prior offenses.
In determining an appropriate sanction, the board took guidance from Louisiana State Bar Ass'n v. Hinrichs , 486 So.2d 116 (La. 1986), wherein the court discussed the factors that influence the severity of the sanction in conversion matters. Specifically, the court stated:
In a typical case of disbarment for violation of DR 9-102 [the precursor to Rule 1.15], one or more of the following elements are usually present: the lawyer acts in bad faith and intends a result inconsistent with his client's interest; the lawyer commits forgery or other fraudulent acts in connection with the violation; the magnitude or the duration of the deprivation is extensive; the magnitude of the damage or risk of damage, expense and inconvenience caused the client is great; the lawyer either fails to make full restitution or does so tardily after extended pressure of disciplinary or legal proceedings.
A three year suspension from practice typically results in cases involving similar but less aggravated factors. In such cases the lawyer is guilty of at least a high degree of negligence in causing his client's funds to be withdrawn or retained in violation of the disciplinary rule. He usually does not commit other fraudulent acts in connection therewith. The attorney usually benefits from the infraction but, in contrast with disbarment cases, the client may not be greatly harmed or exposed to great risk of harm. The attorney fully reimburses or pays his client the funds due without the necessity of extensive disciplinary or legal proceedings.
A suspension from practice of eighteen months or two years will typically result where the facts are appropriate for a three-year suspension, except that there are significant mitigating circumstances; or where the facts are appropriate for a one-year suspension, except that there are significant aggravating circumstances.
A suspension from practice of one year or less will typically result where the negligence in withdrawing or retaining client funds is not gross or of a high degree. No other fraudulent acts are committed in connection with the violation of the disciplinary rule. There is no serious harm or threat of harm to the client. Full restitution is made promptly, usually before any legal proceeding or disciplinary complaint is made.
A reprimand may be appropriate in a case where there is a minor violation of DR 9-102, but there is no conversion or harm to the client. [Citations omitted.]
Finding that respondent's conduct falls within the scope of disbarment pursuant to the guidelines set forth in Hinrichs , the board recommended he be disbarred. The board further recommended respondent provide restitution to SouthShore.
Neither respondent nor the ODC filed an objection to the disciplinary board's recommendation.
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5 (B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct *991 has been proven by clear and convincing evidence. In re: Banks , 09-1212 (La. 10/2/09), 18 So.3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. See In re: Caulfield , 96-1401 (La. 11/25/96), 683 So.2d 714 ; In re: Pardue , 93-2865 (La. 3/11/94), 633 So.2d 150.
The record of this matter supports a finding that respondent converted third-party funds. This conduct amounts to a violation of the Rules of Professional Conduct as found by the disciplinary board.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass'n v. Reis , 513 So.2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington , 459 So.2d 520 (La. 1984).
Respondent knowingly, if not intentionally, violated duties owed to his clients and the public, causing actual harm to SouthShore and potential harm to his clients. The record supports the aggravating and mitigating factors found by the board.
As noted by the board, in Louisiana State Bar Ass'n v. Hinrichs , 486 So.2d 116 (La. 1986), we conducted an extensive review of the jurisprudence in conversion cases in order to determine the appropriate sanctions for different types of conversion. We reserved disbarment, then the most serious sanction available, for conversion cases in which one or more of the following elements are present:
[T]he lawyer acts in bad faith and intends a result inconsistent with his client's interest; the lawyer commits forgery or other fraudulent acts in connection with the violation; the magnitude or the duration of the deprivation is extensive; the magnitude of the damage or risk of damage, expense and inconvenience caused the client is great; the lawyer either fails to make full restitution or does so tardily after extended pressure of disciplinary or legal proceedings.
Here, respondent's conduct falls within the scope of disbarment. Both the magnitude and the duration of the deprivation is extensive. Furthermore, while respondent is making restitution to SouthShore in monthly payments, he only entered into the compromise agreement after the extended pressure of disciplinary and legal proceedings.
Under these circumstances, we will adopt the disciplinary board's recommendation and impose disbarment. We will also order respondent to make restitution to SouthShore.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, it is ordered that J. Morris Dunn, also known as John Morris Dunn, III, Louisiana Bar Roll number 5182, be and he hereby is disbarred. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. It is further ordered that respondent shall make restitution to SouthShore Physician Group. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty *992 days from the date of finality of this court's judgment until paid.